UNITED STATES DISTRCIT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARY ANN PITTMAN,

      Plaintiff,

v.                                 Case No.: 3:17-cv-645-J-34-JBT

JOHNSON & JOHNSON VISION CARE, INC.,

      Defendant.

_____/

DEFENDANT JOHNSON & JOHNSON VISION CARE, INC.'S
MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF
LAW IN SUPPORT THEREOF

Defendant JOHNSON & JOHNSON VISION CARE, INC. ("Defendant" or the "Company"), by and through its undersigned counsel and pursuant to Rule 56, Federal Rules of Civil Procedure, hereby respectfully moves this Court for summary judgment against Plaintiff Mary Ann Pittman ("Plaintiff" or "Pittman") on her two claims for relief against Defendant: (1) gender discrimination in violation of Title VII and (2) gender discrimination in violation of the Florida Civil Rights Act ("FCRA"). For the reasons set forth below, no genuine issues of material fact exist regarding Pittman's claims, and Defendant is entitled to summary judgment as a matter of law.

I.     **INTRODUCTION**

Ms. Pittman is a ***current*** employee of Defendant in Jacksonville, Florida in its Vistakon division.[1] In this lawsuit, Plaintiff alleges that she was not interviewed for or promoted to Vice President of Product Management (Vistakon) in 2015 because she is female. Plaintiff further alleges that three lesser qualified males were interviewed, one of whom was selected for the role.

---

[1] Johnson & Johnson Vision Care, Inc. designs, manufactures and sells disposable contact lenses. *See* Declaration of Christy Macleod at ¶ 3.

However, an evaluation of the now fully-developed record finds no evidence supporting Plaintiff's gender played any role in Defendant's decision not to select her for the Vice President of Product Management (Vistakon) position. In fact, the evidence clearly demonstrates that Defendant selected the most qualified candidate for the position based on the relevant hiring criteria. Consequently, this Court should grant judgment in favor of Defendant as to each of Plaintiff's claims.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Defendant's Policies Prohibit Discrimination.

Defendant is an equal opportunity employer. *See* Declaration of Christy Macleod at ¶ 4, Ex. A. Defendant strictly prohibits unlawful discrimination against any employee or applicant of employment because of the individual's sex or any other characteristic protected by applicable federal, state, or local law. *See id*. All employment decisions and personnel actions must be taken in accordance with all applicable laws relating to equal opportunity. *See id*.

Defendant also maintains a Policy Against Harassment, which prohibits conduct constituting, leading to or contributing to harassment. *See id*. Under the policy, employees who have been subjected to prohibited conduct are "urged and expected to report the relevant facts promptly." *Id*. at Ex. A. The policy further provides an employee may report the information to his or her supervisor or may bypass the reporting chain and "contact whichever of these individuals or anyone else in management the employee feels comfortable contacting." *Id*. Defendant also maintains an employee hotline and website to further report any prohibited conduct. *See id*. at ¶5.

### B.   Plaintiff's Employment with Vistakon.

Defendant (and its related companies) has employed Ms. Pittman for 36 years. *See*

Complt. at ¶ 20 (Doc. No. 1). Initially, Ms. Pittman was hired by Ethicon, Inc. (a Johnson & Johnson company manufacturing surgical sutures and wound closure devices) directly out of college in 1983 as an associate industrial engineer. *See* Deposition of Mary Ann Pittman dated September 11, 2018 ("Plf. Depo.") at 28:17-25; 29:1-6, 14-20. As an associate industrial engineer, Ms. Pittman supported manufacturing processes, set manufacturing standards and worked with product transfers including new products. *See id*. at 29:7-13. Ms. Pittman remained in this role until 1988. *See id*. at 33:13-17.

In 1988, Ms. Pittman became a production supervisor for Ethicon in its finishing, packaging department, which was part of Ethicon's manufacturing function. *See* Plf. Depo. at 34:1-13. Thereafter, and until 1991, Ms. Pittman took the position of "manager, suture starts" within Ethicon. *See id*. at 35:16-20; 36:2-6. The suture starts department was responsible for attaching sutures to needles and then transferring the product to the next department in the manufacturing line. *See id*. at 35:21-25; 36:1. Between 1991 and 1993, Defendant sponsored Ms. Pittman to attend Massachusetts Institute of Technology's two-year dual master's engineering program. *See id*. at 36:7-25; 37:1-7.

In 1993, Ms. Pittman began working for Defendant's Vistakon division, where she has remained until today. In 1993, Ms. Pittman took a position as a "manager inventory control, manager new products planning," which was one position supporting new products as they transitioned from research and development to manufacturing. *See id*. 40:10-25; 41:1-4. In this position, Ms. Pittman managed a raw material warehouse and raw material quality assurance. *See id*. Ms. Pittman remained in that role until 1996. *See id*. at 41:12-16.

Thereafter, in 1996, Ms. Pittman laterally transferred to an operations manager position for first generation disposable contact lens manufacturing technology within Vistakon. *See id*.

41:15-25; 42:1-12. She remained in this role until 1999, when she laterally transferred to the operations manager advanced technology position starting up the third generation technology. *See id*. 43:2-25 – 45:1-5. These positions were manufacturing related. *See id*. at 44:6.

In 2001, Ms. Pittman was promoted to group manager, a position she remained in for two years. *See id*. at 45:20-25. Over the next 10 years, Ms. Pittman held a range of positions within Vistakon. In 2011, Ms. Pittman became a Senior Director for New Process Introduction and Life Cycle Management within Vistakon. *See* Plf's Depo. at 54:21-25. Ms. Pittman remains in this role, but her duties have changed over time. *See id*. at 55:1-6; 57:8-18. Currently, Ms. Pittman handles new product transfers partnering with research and development through the product qualification stage when the product is transferred to the supply chain. *See id*. at 58:15-25. As evidenced by her performance reviews over the relevant years, Ms. Pittman is a solid performer in the organization and a valued partner. In 2013, Ms. Pittman received a Business Results Rating and a Leadership Results Rating of "Fully Meets." [2] *See id*. at Ex. 9. In 2014 and 2015, Ms. Pittman received Business Results Ratings of "Exceeds" and Leadership Results Ratings of "Fully Meets." *See id*. at 79:20-25; 80:1-5; 82:10-24; 83; Exs. 9 and 10. The Talent Card[3] showed Ms. Pittman's target job as a Director 2 of Production Planning. *See id*. at Ex. 10. In 2015, Ms. Pittman reported to Mr. Mike Alleva, then Defendant's Vice President of Product Management (Vistakon). *See id*. at 57:16-21; *see also* Deposition of Mike Alleva dated October 16, 2018 ("Alleva Depo.") at 17:7-10.

C.   **Succession Planning.**

Each year, as part of his supervisory duties, Mr. Alleva prepared succession profiles for

---

[2] The Company provides two ratings: Business and Leadership Results.
[3] Talent Cards contain information regarding an employee's employment with the Company including, among other things, the employee's job title, position grade, manager, company tenure, target job positions, succession profile, track record performance for the prior three years, recent strategic accomplishments, development plan, experience, job history, and education. *See* Plf. Depo. at Exs. 9 and 10.

4

succession planning for each of his direct reports, including Ms. Pittman. *See* Alleva Depo. at 85:10-24. Succession profiles identify internal candidates who are the potential backfills for a particular job within the Company. *See* Plf. Depo. Exs. 9 and 10.  In other words, the succession profile tracks where the Company sees an employee's potential for a future role(s). *See id.* The succession profile then identifies the various positions along with the employee's readiness for those positions. The Company utilizes multiple succession plan readiness designations: Ready Now (0-12 months); Ready Later (1-3 years); Ready Future (3-5 years); and Emerging Talent (5+ years). *See id.*

After completing the succession profiles for his direct reports, including Ms. Pittman, Mr. Alleva would meet with his supervisor, Mark Benson, Vice President, Supply Chain for Diabetes and Vision Care (which includes Vistakon), as well as Mr. Benson's leadership team, to conduct in-depth discussions about the appropriateness of each direct report's succession profile. *See* Deposition of Mark Benson dated September 27, 2018 ("Benson Depo.") at 90:18-25; 168:13-25. As a result of these discussions, the team would reach a consensus on each direct report's succession profile. *See id.* at 93:19-21; 168:13-25; 169:1-13. If any of Mr. Alleva's initial assessments changed based on the team's consensus, Mr. Alleva was tasked with revising the succession profile on the Talent Card and communicating the team's feedback and resulting succession profile change to the affected direct report. *See id.* 91:3-14; 93:5-8.

In 2015, Mr. Alleva met with his supervisor, Mark Benson, and Mr. Benson's leadership team, to discuss each individual and receive feedback on the succession planning profiles. *See* Benson Depo. at 78:23-25; 79:1-5; *see also* Alleva Depo. at 88:23-24: 89:1-12. Mr. Alleva, Mr. Benson and Mr. Benson's team discussed Ms. Pittman's succession plan readiness and determined she was <u>not</u> "Ready Now" for the Vice President, Product Management (Vistakon)

position. *See* Benson Depo. at 78:23-25; 79:1-5; 86:21-25; 87:1-2; 93:9-21; 168:13-25; 169:1-13; *see also* Alleva Depo. at 88:17-21; 89:19-24: 90:1-24: 91:1-22; 92:1-11. Mr. Benson's leadership team concluded Ms. Pittman needed to exhibit stronger leadership skills and experience, as well as obtain experience outside Vistakon/Vision Care. *See* Alleva Depo. at 90:2-24; Benson Depo. at 102:16-25; 103:1-6. Mr. Alleva spoke with Ms. Pittman and provided her the feedback from the group, but inadvertently did not update her Talent Card to reflect the change from "Ready Now" to "Ready Later" with regard to the Vice President, Product Management (Vistakon) position. *See* Benson Depo. 105:1-14:106:5-12; Alleva Depo. at 101:16-24; 102:1-19; 103:4-5, 20-24; 104:1-23. Specifically, Mr. Alleva told Ms. Pittman he initially designated her "Ready Now;" however, after the succession planning discussion among the team, the consensus was that she was "Ready Later" because she could benefit from a role outside of Vision Care and stronger collaboration credentials. *See* Alleva Depo. at 104:11-22; 105:24; 106:1-13.

Given Mr. Benson's leadership team's "Ready Later" assessment of Ms. Pittman, Mr. Benson and Mr. Alleva pushed for development opportunities for her within the Company. In June 2015, the Senior Director Product Planning position became available. *See* Benson Depo. 165:14-25; 166 – 167; Alleva Depo. at 116:3-24; 117:1-24. Mr. Benson and Mr. Alleva believed Ms. Pittman would be perfect for this Director Level 2 position as it would provide her with valuable leadership experience she did not currently have and would position her nicely for a vice president level role in the future.  *See* Benson Depo. at 108:9-11; 166:17-25; 167:1-7; Alleva Depo. at 116:3-24; 117:1-24. Specifically, the role would have provided Demand and Production Planning experience in both Diabetes Care and Vistakon (without which she would only have Production Planning experience within Vistakon), as well as current experience outside of Vistakon and board-level interaction. *See* Benson Depo. 110:6-8; 167:3-7:

Alleva Depo at 116:16-24; 117:1-24; 119:11-16. Ms. Pittman would have also become a direct report to Mr. Benson and a part of his leadership team. *See* Plf. Depo. 85:23-25; Benson Depo. 108:3-8; Alleva Depo. at 117:11-14. With this role, Ms. Pittman would have had the desired experience necessary to transition into a vice president role. *See* Benson Depo. at 113:20-25; 114:1-7; Alleva Depo. at 117:15-20. However, much to Mr. Benson's and Mr. Alleva's surprise, Ms. Pittman was not excited about the opportunity, and she rejected the opportunity to be considered for the Senior Director Product Planning role because it did not carry a vice president title. *See* Benson Depo. at 108:12-19; Alleva Depo. at 117:21-24; 118:1-20; 125:10-11; Plf. Depo. at 86:1-3, 10-13. Ironically, the Senior Director Product Planning position eventually became a vice president role. *See* Plf. Depo. at 86:17-19. Subsequently, when that vice president position became vacant again last year, Mr. Benson filled it with the most qualified candidate, who was a female. *See* Benson Depo. at 17:17-25; 18:13-21.

### D.      Vice President of Product Management (Vistakon) Position.

In October 2015, the Vice President, Product Management (Vistakon) position became available when Mr. Alleva moved into a Vice President, Product Management (Diabetes) position. *See* Plf. Depo. at 108:23-25; 109:1-10. The Vice President, Product Management (Vistakon) position reports to Mr. Benson, who had final hiring approval. *See* Benson Depo. at 15:1-1-8.[4] This position is a critical leadership position sitting both on the Vision Care Global Management Board and the Consumer Medical Devices Supply Chain Leadership Team. *See id.* at Ex. 1.   The person in this role is responsible for value chain management for the Vision Care franchise, including the following: (1) implementing value chain management to improve supply chain capability; (2) introducing new product and developing supply chain; (3) partnering with

---

[4] Since 2014, Mr. Benson has promoted four individuals from a director level to a vice president level. *See* Benson Depo. at 17:17-25; 18:1-24. Two were male and two were female. *See id.* at 18:9-24.

research and development and manufacturing to scale production capabilities; (4) facilitating product strategy and lifecycle management (i.e., ensuring the product meets the requirements of the customer over the duration of the product's life); and (5) providing network strategy and optimization and product value stream management. *See id*.; *see also* Benson Depo. at 65-66. The required education and experience for the position are a Master's degree or equivalent and a minimum 15 years in managing all aspects of operations (inclusive of areas like production, planning, supply chain, quality, technical operations and engineering) within a global and international organization, preferably in a medical devices environment. *See id*. at Ex. 1.

Mr. Benson and his then supporting Human Resources Director, Scott Montermurno, discussed the "success criteria" for the position, including a strong Supply Chain background, strong new product introduction and innovation experience at the senior board level, outstanding collaboration skills, and the ability to work effectively at the board or leadership team level. *See* Benson Depo. at Ex. 8. The position was one of talent development, prime for someone who would move up within the Johnson & Johnson Supply Chain ("JJSC"). *See id*. Mr. Benson also wanted a candidate with experience outside of Vistakon to bring a different perspective to the leadership role that would allow for new, innovative ideas in an effort to sharpen Vistakon's competitive edge in the marketplace. *See id*. at 75:22-25; 76:1-15; 140:17-25; 141:1-9.

With these success criteria in mind, Mr. Benson and Mr. Montermurno considered several people for the Vice President, Product Management (Vistakon) role, including those who were on succession pipelines, those with whom they were familiar, external candidates, employees who indicated they were interested in the role, and employees recommended by others within Johnson & Johnson. *See id*. at 22:1-6, 20-25; 23:1-4; 60:23-25; 61:1-4; 71:22-25. Mr. Benson also considered stakeholder feedback for recommendations of employees to consider

for the open role. *See id*. at 59:8-12. In evaluating candidates for the position, Mr. Benson looked beyond the succession pipeline to ensure the best talent filled the vacant role and, in doing so, Mr. Benson considered other factors, such as the vacant role's job description, employee Talent Cards showing succession profiles and readiness designations, and the position's success criteria.[5] *See id*. 59:8-12; 61:1-4; 89:6-18; 129:21-25. However, the succession profiles and readiness designations, such as "Ready Now" or "Ready Later," are not determinative factors in whether someone is considered for an open position. *See id*. at 62:7-10; 94:8-13. In fact, simply because someone is designated "Ready Now" does not mean an open position is right for them at that time. *See id*. at 63:3-6.

On October 30, 2015, Ms. Pittman contacted Mr. Benson and expressed her interest in the Vice President, Product Management (Vistakon) role. *See* Plf. Depo. at Ex. 16.  Mr. Benson advised Ms. Pittman she would receive "full consideration" for the role. *See id*. In fact, Mr. Benson and Mr. Montermurno considered Ms. Pittman and discussed her qualifications on more than one occasion with regard to the Vice President, Product Management (Vistakon) role. *See* Benson Depo. at 101:15-21; 137:1-4, 23-25; 138:1-15; 168:1-12; *see also* Deposition of Scott Montermurno dated November 19, 2018 ("Montermurno Depo.") at 58:5-25; 59:1-15. At least 13 different people were considered for the position, including two other females. *See* Benson Depo. at 101:6-14; 130:21-25; 131:1-24; 148-149. Consequently, after considering Ms. Pittman and other male and female candidates, Mr. Montermurno and Mr. Benson selected one internal

---

[5] Based on deposition questions posed to defense witnesses, Ms. Pittman may argue that Credo scores were somehow relevant to the success criteria for the Vice President, Product Management (Vistakon) position. Ms. Pittman misses the mark. By way of background, the Credo is a guiding set of principles that has existed for more than 75 years. *See* Benson Depo. at 45:2-23; 46:1-5. Credo values are instrumental to all employees in carrying out their work performance. Although Credo scores are important as it relates to overall company values, specific Credo scores were not one of Mr. Benson's enumerated success criteria he considered when filling the Vice President, Product Management (Vistakon) role, as these are basic core values all employees must uphold on a daily basis. *See* Benson Depo. at 132:21-25; 133:1-4.  Furthermore, it would not be feasible to factor these scores into the hiring criteria because both internal and external candidates were considered for the role and it would be impossible for an external candidate to possess such a score.

(Mr. James Conroy) and one external (Mr. Quincy Troup) candidate to interview because they believed these candidates met the success criteria Mr. Benson had identified. *See* Benson Depo. at Ex. 8; Montermurno Depo. at 62:4-7.

However, Valerie Love, then Vice President Human Resources for Johnson & Johnson Vision Care, strongly encouraged Mr. Benson and Mr. Montermurno to interview at least one Vistakon candidate from Jacksonville. *See* Benson Depo. at 100:2-17; Montermurno Depo. at 71:24-25; 72:1-5. Ms. Love advocated strongly on behalf of Ronnie Hawthorne. *See id*. No one advocated on behalf of Ms. Pittman. *See id*. at 139:25-140:1-2. Based on Ms. Love's strong sponsorship, as well as Mr. Hawthorne's experience, qualifications, and Leadership Results Ratings of "Exceeds" for the previous three years, Mr. Hawthorne was considered the strongest candidate of the Jacksonville employees and was therefore added as a third candidate selected for interviews. *See id*. at 76:23-25; 77:1-18; 78:4-12.[6] Importantly, interviewing Mr. Hawthorne (someone from Jacksonville) was a courtesy to address Ms. Love's concerns. *See id*. at 78:1-6; *see also* Montermurno Depo. 101:15-17.

Six individuals interviewed the three candidates. As part of the interview process, each of the three candidates interviewed were evaluated on the success criteria, including a strong Supply Chain background, strong new product introduction and innovation experience at the senior board level, outstanding collaboration skills, the ability to work effectively at the board or leadership team level, upward potential and experience outside of Vistakon to bring a different

---

[6] Although Mr. Hawthorne, like Ms. Pittman, did not have experience outside of Vistakon and was not seen as someone who could move on and up outside of Vistakon, he was seen by Mr. Benson as having broader supply chain experience and as a strong collaborator because Mr. Hawthorne served on the leadership team board and worked extensively in Vision Care across research and development and commercial groups. *See* Benson Depo. at 81:8-24; 111:8-12, 22-25; 112:1-6; 112:15-21; 123:9-18;124:11-18. The board on which Mr. Hawthorne served sought his input to move key action items forward, he improved the efficiency of the team, drove strategic plan development and collaborated with key leaders across the organization. *See id*. at 112:15-21; 113:11-19. There was no dispute Mr. Hawthorne was "Ready Now" for the Vice President, Product Management (Vistakon) position. *See* Alleva Depo. at 92:12-24; 93-94.

perspective to the leadership role that would allow for new, innovative ideas in an effort to sharpen Vistakon's competitive edge in the marketplace. *See* Alleva Depo. at Ex. 10; *see e.g.*, Benson Depo. at Ex. 8. Following the interviews, Mr. Conroy was offered the position because he was the most qualified candidate.  *See* Benson Depo. at 24:22-24; Montermurno Depo. at 102:5-19; 118:9-24.

Mr. Conroy had several years of outside experience with Kodak, as well as international experience with other divisions of the company outside of Vistakon. *See* Benson Depo. at 155:10-15. Mr. Conroy also worked on the most successful programs involving the most innovative and challenging Diabetes device Mr. Benson had worked on in his career. *See id*. at 156:9-12. Mr. Conroy also had packaging and labeling experience. *See id*. at 156:13-17. At the time of the interview, Mr. Conroy was rated "Exceeds" in the Leadership Results component and "Fully Meets" in the Business Results component. *See id*. at 159:5-8. Mr. Conroy was already in the Supply Chain pipeline, had the requisite innovation experience leading R&D, and was undisputedly designated "Ready Now" for the comparable vice president role in the Diabetes Care division. *See* Benson Depo. at 97:13-19. Mr. Conroy hit all the right notes with respect to the success criteria Mr. Benson required to fill the Vice President, Product Management (Vistakon) position.

On the other hand, Ms. Pittman did not meet all the success criteria Mr. Benson considered necessary for the role. *See* Benson Depo. at 80:24-25: 81:1-7; 101:22-25; 102-103. For example, Ms. Pittman lacked experience leading innovation at the senior board level and highest leadership level within an organization and was not seen as a strong collaborator. *See* Benson Depo. at 81:4-7; 102:16-25; 103:1-6. She did not have experience working at the board level of the leadership teams of Vistakon or Diabetes Care. *See id*. at

126:18-24. Although Ms. Pittman had experience outside of Vistakon, at Ethicon, such experience was stale as it was more than 15 years prior and was focused on manufacturing rather than innovation. *See* Benson Depo. at 76:11-18; 81:4-7. Mr. Benson considered that experience to be at a much more junior level than would be required in the role at issue, and he was looking for someone with diverse experiences at a high level in the recent past. *See id*. at 76:11-18. Ms. Pittman's Leadership Results Rating was "Fully Meets" and not "Exceeds" as Mr. Conroy's (and Mr. Hawthorne's for that matter). *See* Plf. Depo. at Exs. 9 and 10. As a result of her experience and qualifications, Ms. Pittman was not comparable to the three candidates who were selected for an interview and, **as to the ultimate issue before this Court**, was not equally or more qualified than Mr. Conroy for the Vice President, Product Management (Vistakon) position. *See id*. at 116:3-25; 117:2, 12-25; 118-119; Benson Depo. at 74:23-25; 75:1-15; 76:11-18; 80:24-25: 81:1-7; 97:13-19; 101:22-25; 102-103; 126:18-24; 155:1-10; 156:9-17; 159:5-8; Montermurno Depo. at 102:5-19; 118:9-24.[7]

On November 10, 2015, Mr. Benson spoke with Ms. Pittman and explained why she was not selected for an interview. *See* Benson Depo. at 74:11-25; 75:1-15; Plf. Depo. at 116:3-14. Specifically, Ms. Pittman was not selected because the top three candidates had strong experience in product management, potential to move within JJSC, recent experience outside of Vistakon that would bring new ideas and thought leadership, and broad supply chain experience. Mr. Benson reiterated strength of leadership was very important for the role. *See* Plf. Depo. at 117:12-25; 118-119.[8]

---

[7] Although, Ms. Pittman's Talent Card incorrectly reflected a readiness designation of Ready Now for the Vice President, Product Management (Vistakon) position because Mr. Alleva had inadvertently not changed it, Ms. Pittman admitted in her deposition that a Ready Now readiness designation does not guarantee an employee an interview for that particular position or selection to fill the vacant role. *See* Plf. Depo. 87:6-25; *see also* Alleva Depo. 102:3-19.

[8] While not binding on the Court's disposition of this matter, it should be noted Ms. Pittman initially complained internally that she did not receive the Vice President, Product Management (Vistakon) position based on her gender.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate if, through pleadings, depositions and documents, it appears no genuine issue of any material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1309 (11th Cir. 1994). The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion and the absence of a genuine issue of material fact. *See id.* If this initial burden is met, the burden shifts to the non-moving party to establish genuine issues of material fact exist. *See id.*

A plaintiff cannot defeat summary judgment by resting upon conclusory allegations in the pleadings. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be defeated merely on the basis of "metaphysical doubt" about material facts or on the basis of "conjecture or surmise." *Matshuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). Instead, the plaintiff must present "specific facts showing that there is a genuine issue for trial." *Id.* at 587. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the non-moving party's evidence is "merely colorable, or is not significantly probative," then summary judgment is appropriate. *Anderson*, 477 U.S. at 249-50.

## IV.   LEGAL ARGUMENT

Plaintiff claims Defendant denied her the Vice President, Product Management (Vistakon) position because she is female in violation of Title VII and the FCRA. Her claims fail because although Plaintiff was considered for the role, she was not equally or more qualified for

---

*See* Pfl. Depo. 164:5-12, Ex. 20. Her claim was investigated and determined to be unfounded. *See* MacLeod Dec. at ¶ 6.

the position than the selected candidate. Moreover, Plaintiff cannot show Defendant's legitimate, nondiscriminatory reason for its decision—Mr. Conroy's greater relevant expertise and qualifications—was pretext for gender discrimination. Specifically, Plaintiff must show not merely that Defendant's employment decisions were mistaken but that they were in fact motivated by sex. Based upon the undisputed material facts in this case, Defendant is entitled to summary judgment in full.

A.  **Plaintiff Cannot Sustain Her Discrimination Claims with Circumstantial Evidence under the *McDonnell Douglas* Framework.**

Title VII prohibits employers from discriminating against employees "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). The FCRA also makes it an unlawful discriminatory practice for an employer to discriminate based on sex. *See* §760.10(1)(a), Florida Statutes. Where, as here, an employee bases her discrimination claim on circumstantial evidence,[9] this Court must apply the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this analysis, a plaintiff must first establish a *prima facie* case of discrimination under Title VII. To do so with respect to a promotional decision, Plaintiff must prove: (1) she is a member of a protected minority, (2) she was qualified and applied for the promotion, (3) she was rejected despite these qualifications, and (4) other equally or less qualified employees who are not members of the protected minority were promoted. *See Lee v. GTE Fla., Inc*., 226 F.3d 1249, 1253 (11th Cir. 2000).[10]

If Plaintiff establishes a *prima facie* case of discrimination, the burden shifts to Defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *See id*.

---

[9]  Plaintiff does not allege direct evidence of discrimination in her Complaint and no evidence of same came forward during discovery.

[10]  "[D]ecisions construing Title VII guide the analysis of claims under the Florida Civil Rights Act." *Penaloza v. Target Corp*., No. 8:11-CV-2656-T-33AEP, 2012 WL 6721011, at *7 (M.D. Fla. Dec. 27, 2012), *aff'd*, 549 F. Appx. 844 (11th Cir. 2013). As a result, Plaintiff's two claims stand or fall together.

"[T]he defendant's burden of rebuttal is exceedingly light . . . . At this stage of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Cooper v. S. Co.*, 390 F.3d 695, 735 (11th Cir. 2004), overruled on other grounds, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).

If Defendant meets this burden of production, then Plaintiff must establish Defendant's proffered reasons for her rejection were pretextual. *See Lee*, 226 F.3d at 1253. In a failure to promote case, Plaintiff cannot prove pretext by simply showing she was better qualified than the individual who received the position she wanted. *See id.* She must show Defendant's employment decisions were mistaken and were in fact motivated by sex. *See id.*

### 1.   Plaintiff Cannot Establish a *Prima Facie* Claim of Gender Discrimination.

Here, Plaintiff cannot establish the second, third or fourth prongs of her *prima facie* case.[11] With respect to the second and third prongs, Plaintiff advised Mr. Benson she was interested in the Vice President, Product Management (Vistakon) position; there was no formal application process. However, as set forth more fully above, Plaintiff lacked the requisite qualifications and success criteria Mr. Benson had identified for the position. Specifically, Plaintiff had not worked outside of Vistakon since 1993. She had no experience outside of the company umbrella having spent her entire career working for Johnson & Johnson companies. As reflected in her "Fully Meets" (but not "Exceeds") Leadership Results Rating, Plaintiff was not a strong collaborator, she had not demonstrated an ability to work effectively at a board or leadership team level, and she was not seen as someone who would move on and up within the Johnson & Johnson organization outside of Vistakon. In fact, when approached to fill a position that would provide her with exposure to a different division of Johnson & Johnson outside of

---

[11] Plaintiff is female and, therefore, the parties do not dispute the first prong.

Vistakon, and allow her to develop the necessary skills to operate successfully as a vice president within the company, Plaintiff balked at what she considered to be a "lateral" transfer because of its non-vice president title and rejected the opportunity.

Additionally, Plaintiff cannot establish the fourth prong of her *prima facie* gender discrimination claim, as the individual selected for Vice President, Product Management (Vistakon) role was not equally or less qualified than Plaintiff. To the contrary, it is undisputed Mr. Conroy was selected for the role because he met all of Mr. Benson's success criteria. Mr. Conroy not only had experience outside of Johnson & Johnson, and the valuable insight those experiences could add to the role, but also demonstrated talent development within the company as exhibited by his more recent experience with other divisions within Johnson & Johnson. Mr. Conroy also had board level experience that Plaintiff did not. Thus, Plaintiff cannot establish she was similarly situated to Mr. Conroy *in all relevant respects* as she must, at a miniumum, to establish a *prima facie* claim of gender discrimination based upon a failure to promote.[12] *See Johnson v. Coffee Cnty. Comm'n*, 714 Fed. Appx. 942, 946-947 (11th Cir. 2017) (affirming summary judgment on failure to promote claim where selected candidate held license that plaintiff lacked, because "[t]o be a proper comparator for purposes of the fourth prong, the other employee must be 'similarly situated [to the plaintiff] in all relevant respects'" (quoting *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010)).

To be clear, Plaintiff cannot establish a *prima facie* case because, as shown above, she was neither equally nor more qualified than Mr. Conroy, the candidate who was promoted to the position of Vice President, Product Management (Vistakon). Indeed, Plaintiff's belief she was subjected to gender discrimination appears to be largely based on the fact her "Talent Card"

---

[12] Although not relevant for purposes of Plaintiff's *prima facie* case of discrimination, Plaintiff's alleged comparison to Mr. Hawthorne and Mr. Troupe fare no better and fail for the same reasons.

incorrectly identified her as "Ready Now" for the role and her own assessment she was more qualified for the position based upon her own subjective qualification criteria. As set forth above, the consensus of Mr. Benson's leadership team was that Plaintiff was not "Ready Now" but was instead "Ready Later." Regardless, as Plaintiff concedes, her "Ready Now" designation for the Vice President, Product Management (Vistakon) position did not guarantee her an interview for, or placement into, the vacant role. Indeed, across the Company, there are many employees with the same designation for that role. This "Ready Now" designation is only one minor thing evaluated in determining who will receive an interview or be selected for the position. Not all individuals with a "Ready Now" designation were interviewed for, and certainly all could not be placed in, the open position. Nevertheless, despite being designated "Ready Later," Ms. Pittman was considered for the open Vice President, Product Management (Vistakon) role; however, Mr. Conroy was undisputedly designated "Ready Now" for the comparable position within Diabetes Care and, most importantly, was the most qualified candidate for the Vice President, Product Management (Vistakon) position. Consequently, Plaintiff has not met her burden of showing a *prima facie* case of gender discrimination, and Defendant is entitled to summary judgment in that regard.

> **2.     Defendant Proffered a Legitimate, Non-Discriminatory Reason for Not Selecting Plaintiff for the Vice President of Product Management Position.**

Even if Plaintiff could make a *prima facie* case for gender discrimination, which she cannot, summary judgment is warranted in any event. The undisputed facts support only one conclusion – Plaintiff was not selected for the Vice President, Product Management (Vistakon) position for legitimate, non-discriminatory reasons. Plaintiff claims she was not selected because she is female.  This is false. The undisputed facts concerning Defendant's selection of Mr. Conroy do not support Plaintiff's theory. There is no evidence Mr. Benson made the selection

decision based on anything other than the more substantial and relevant experience Mr. Conroy could bring to the position. The evidence clearly establishes Mr. Conroy was the most qualified candidate. These facts are fatal to Plaintiff's claim. *See Carter v. Fla. Auto. Servs. LLC*, No. 8:13-CV-143-T-30TBM, 2014 WL 3385048, a *6-7 (M.D. Fla. July 10, 2014) (the selected candidate's outstanding customer service skills and outgoing personality were legitimate reasons for selection).

### 3. There Is No Evidence Defendant's Legitimate, Non-Discriminatory Reason for Its Actions Are Pretext for Gender Discrimination.

Defendant has articulated legitimate, nondiscriminatory reasons for not selecting Plaintiff for the Vice President, Product Management (Vistakon) position. Namely, Plaintiff was not qualified for the position, and Mr. Conroy met all the success criteria Mr. Benson identified, including: a strong Supply Chain background, strong new product introduction and innovation experience at the senior board level, outstanding collaboration skills, the ability to work effectively at the board or leadership team level, upward potential, and experience outside of Vistakon to bring a different perspective to the leadership role that would allow for new, innovative ideas in an effort to sharpen Vistakon's competitive edge in the marketplace. Plaintiff must now show Defendant's proffered reasons were pretexts for discrimination on the basis of gender.  She cannot do so.

"[I]n order to show pretext, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Goodman v. Ga. Sw.*, 147 Fed. Appx. 888, 891 (11th Cir. 2005). In a non-selection case, the plaintiff cannot establish pretext by "simply arguing or even by showing that he was better qualified" than the selectee. *See Springer v. Convergys Customer Mgmt. Group*, 509 F.3d

1344, 1349 (11th Cir. 2007) (quotation omitted). To show pretext by asserting superior qualifications, a "plaintiff must show that the disparities between the successful applicant's and [his] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Brooks v. County Comm'n of Jefferson County, Ala*., 446 F.3d 1160, 1163 (11th Cir. 2006); *see also Fraser v. J.C. Penney Corp., Inc*., 733 Fed. Appx. 969, 976, fn. 4 (11th Cir. May 4, 2018); *Soliman v. Hillsborough Sch. Dist*., No. 806-CV-1811-T-30MSS, 2008 WL 1995001, at *6 (M.D. Fla. May 8, 2008) ("the court should determine whether any disparity is so great that a reasonable fact finder could infer that the employer did not believe that the comparator was better qualified. . . . Plaintiff cannot show pretext by questioning the wisdom of the decision maker, as long as any subjective reason used was one that may motivate a reasonable employer.").

The evidence here clearly demonstrates, and Mr. Benson testified that, in his judgment, the person selected for the position (Mr. Conroy) had more of the qualifications he was seeking in the role than Plaintiff at the time the decision was made to fill the Vice President, Product Management (Vistakon) role. As the Eleventh Circuit has explained, "[i]f an employer selects the person it believes is best qualified, an argument of pretext ordinarily will fail." *See Smith v. Horner*, 839 F.2d 1530, 1538 (11th Cir. 1988). Mr. Conroy's experience is undisputed. In contrast, Plaintiff did not have the desired outside work experience or board level leadership, among other things. These very reasons were highlighted to Plaintiff when Mr. Alleva met with her and advised Plaintiff that her readiness designation for the Vice President, Product Management (Vistakon) role had been changed. Instead of considering the feedback from the succession planning and heeding her manager's (Mr. Alleva's) advice regarding the Senior

Director Product Planning role, Plaintiff rejected the opportunity to pursue that position, which would have provided her the requisite experience she needed for a vice president role. She cannot now be surprised or complain Defendant's reasons for not promoting her are pretextual. Any such argument is disingenuous.

Plaintiff cannot successfully maintain a gender discrimination claim by simply questioning the wisdom of Defendant's decision to hire the most qualified candidate after the fact. She must show Defendant's decision was, in fact, motivated by sex. Again, this she cannot do.

The record evidence is insufficient to raise a genuine issue of material fact regarding whether the Company's stated reason for promoting Mr. Conroy instead of Plaintiff is pretextual. It is undisputed Mr. Conroy was more qualified for the position than Plaintiff. Even if Plaintiff was equally or more qualified, which she was not, Plaintiff has not met her burden of showing the disparities between her qualifications and Mr. Conroy's were so severe no reasonable person could have chosen Mr. Conroy over her. The fact Plaintiff subjectively believes she was the most qualified candidate holds no weight. *See Brooks*, 446 F.3d at 1163-64 (the inquiry at the third stage of the *McDonnell Douglas* analysis of a failure to promote claim is not concerned with a plaintiff's belief she was more qualified than the person hired). It is not enough for Plaintiff to argue with Defendant's decision. Whether Plaintiff agrees with Defendant's employment decision is completely irrelevant.

Plaintiff also cannot overcome her lack of evidence merely by contending she would impose a different standard. Regarding the use of subjective evaluations of a job candidate's qualifications, the Eleventh Circuit has stated that "subjective evaluations of a job candidate are often critical to the decisionmaking process." *Johnson v. Secretary, U.S. Dept. of Veterans*

*Affairs*, 517 Fed.Appx. 933, 936 (11th Cir. 2013) (quoting *Chapman*, 229 F.3d at 1033). "Personal qualities also factor heavily into employment decisions concerning supervisory or professional positions." *Id*. Although an interview may be critical in evaluating a candidate's personal qualities, it may not be necessary where the decisionmaker has first-hand knowledge of the candidate. *See id*. Simply put, subjective evaluation is allowed under Title VII. *See Johnson*, 517 Fed. Appx. at 936. Thus, any argument that a different decision would have been wiser or more conciliatory is insufficient to establish pretext. Notably, to her detriment, Plaintiff agreed that it was a business decision as to who should fill the Vice President, Product Management (Vistakon) role and that her opinion regarding the relevant factors to consider, who was most qualified for the role, or the appropriateness of the business decision could differ from the decisionmakers. *See* Plf. Depo. 89:5-25; 90-93; 94:1-3. Likewise, it is not for this Court to sit "as a super-personnel department" reexamining Defendant's business decision. *See Elrod v. Sears, Roebuck & Co*., 939 F.2d 1466, 1470 (11th Cir. 1991); *see also Johnson v. Secretary, U.S. Dept. of Veterans Affairs*, 517 Fed.Appx. 933, 936 (11th Cir. 2013) ("[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions.").

As previously explained, Plaintiff has not, and cannot, credibly counter Defendant's legitimate, nondiscriminatory reason for not promoting her. Plaintiff has absolutely no evidence of gender discrimination and has failed to raise even an inference of pretext. As such, Defendant is entitled to summary judgment on her failure to promote claims. *See Chapman v. AI Transp*., 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc) ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.")

## V.  **CONCLUSION**

For the foregoing reasons, Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims, and respectfully requests an Order: (i) granting this Motion; (ii) entering judgment for Defendant and against Plaintiff on all claims; (iii) dismissing Plaintiff's claims with prejudice; and (iv) awarding such other relief as this Court deems just and proper.

Dated this 1st day of February, 2019.

Respectfully submitted,

LITTLER MENDELSON, P.C.
111 North Magnolia Avenue, Suite 1250
Orlando, FL  32801-2366
Telephone:  407.393.2900
Facsimile:   407.393.2929

By:      */s/ Kimberly J. Doud, Esquire*_____
Jeffrey B. Jones, Esquire
Florida Bar No. 039950
Email:  jbjones@littler.com

Kimberly J. Doud, Esquire
Florida Bar No.: 0523771
Email:  kdoud@littler.com

Attorneys for Defendant Johnson & Johnson Vision Care, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of February, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a copy via email to the following:  T.A. Delegal, III, Esquire, James C. Poindexter, Esquire, Delegal Law Offices, P.A., 424 East Monroe Street, Jacksonville, Florida 32202, tad@delegal.net; james@delegal.net; office@delegal.net.

*/s/ Kimberly J. Doud*_____
Kimberly J. Doud, Esquire

FIRMWIDE:161814294.4 055020.1022