IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARY PITTMAN,

        Plaintiff,                    CASE NO.: 3:17-cv-000645-MMH-JBT

vs.

JOHNSON & JOHNSON
SERVICES, INC.

        Defendant.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff MARY ANN PITTMAN, and submits this response in opposition

to Defendant JOHNSON & JOHNSON VISION CARE, INC.'s motion for summary judgment. Doc.

21. The record shows that the facts claimed by Defendant are disputed, that substantial pretext

undermines the Defendant's asserted reasons for Plaintiff's non-promotion, and that a jury question

exists as to whether Plaintiff was denied a promotion based on her gender.

**I.      INTRODUCTION**

For the position of Vice President of Product Management for Vision Care ("the Position"),

Defendant engaged in an intensive "succession planning" process, in which it evaluated the readiness

of various employees for the role.  Doc. 24-2 at 32-47.[1]  Succession planning involved extensive

analysis and review of the various persons in the organization, and the goals of the organization for

development of talent.  Doc. 24-2 at 32-36.  At the end of the succession planning process, Plaintiff

_____

[1] Plaintiff references record evidence that it has filed through this Court's CM/ECF
system by using the "Doc." followed by the document number assigned by the CM/ECF system,
followed by the page number(s) assigned by the CM/ECF system. These page numbers do not
necessary correspond with transcript page numbers or document Bates numbers.

was designated as "Ready Now" for the Position on May 28, 2015. Doc. 24-2 at 42. In November 2015, Defendant promoted Jim Conroy to the Position. Conroy was rated "Ready Now" for another vice president position (for which Plaintiff was also rated "Ready Now"), but he was not rated "Ready Now" for the Position. *Id*.

## II.    DEFENDANT HAS GIVEN A FALSE STORY ABOUT PLAINTIFF'S RATING

Defendant now asserts that Plaintiff was actually **not** rated "Ready Now" for the Position at the time of the promotion. Doc. 21 at 5-6. Defendant's claim is contradicted by clear evidence to the contrary. First, Plaintiff is rated "Ready Now" in a document recapping the succession planning meeting, sent within a week of the May 28, 2015 meeting when Defendant now claims the rating was changed. Doc. 24-2 at 31. The cover email to the document states "Attached is the PowerPoint presentation with updated pipelines per our succession planning discussion last week." *Id.*    A director of human resources next sent Plaintiff's supervisor, Mike Alleva, the "talent cards" for his director reports on June 8, 2015, on which Plaintiff was shown as "Ready Now" for the Position. Doc. 24-2 at 51. The talent card for Mike Alleva, who held the Position until the promotion in question, listed Plaintiff as a "Ready Now" successor for the Position. Doc. 24-2 at 54.

Mike Alleva met with Plaintiff on June 10, 2015, and specifically told her that she was "Ready Now" for the Position and for two other vice presidencies. Doc. 24-11 at 100-106. Plaintiff's handwritten notes confirm the conversation. *Id*. Doc. 24-12 at 77. When Plaintiff asked Alleva about her potential promotion to the Position on October 29, 2015, he never mentioned any supposed change to her "Ready Now" status. Doc. 24-2 at 59. When Plaintiff asked Benson to be considered for the Position in October 2015, Benson never suggested that Plaintiff's "Ready Now"

status for the Position had changed. Doc. 24-12 at 85. Instead, while reviewing documents during the promotion process (late October/early November 2015), Benson's HR partner, Scott Montemurno reviewed Plaintiff's "talent card", and saw that she was rated "Ready Now." Doc. 24-9 at 45. When Benson spoke with Plaintiff in November 2015 to inform her that she had not been chosen for interview, he never informed her that her "Ready Now" status had been revised. Doc. 24-11 at 115-119; Doc. 24-12 at 86; Doc. 24-3 at 74-78. The first time that Plaintiff was ever informed that she was supposedly not "Ready Now" for the Position was May 16 2016, after Defendant conducted its internal investigation. Doc. 24-8 at 11.

The evolution of Defendant's story surrounding Plaintiff's "Ready Now" status is troubling. During Defendant's internal investigation process, Benson claimed that he and Alleva had decided before the promotion to change Plaintiff's "Ready Now" status. Yet, when the internal investigator (Williams) interviewed Mike Alleva on April 27, 2016, Alleva clearly stated that Plaintiff was "Ready Now" for the Position. Doc. 24-13 at 125-126; Doc. 24-14 at 54. Williams' notes from the interview reflect that Alleva told him "RN for my old role, Ann has readiness for role I was in." *Id.* Alleva recalled no discussion with Benson about changing Plaintiff's rating. Doc. 24-13 at 126-127.

After Williams completed his report, Alleva called Williams on May 13, 2016, and changed his account of Plaintiff's "Ready Now" status from his initial April 27, 2016 account. Doc. 24-13 at 132-134; Doc. 24-14 at 58 In contrast to his April 27th statement, Alleva stated on May 13th that Plaintiff was not "Ready Now" for the position. Doc. 24-13 at 135. Finally, in his 2018 deposition, Alleva suddenly remembered a group conversation during the May 28, 2015 succession planning meeting ,when Plaintiff was supposedly deemed not "Ready Now." Doc. 24-1 at 146.

The first suggestion of any change to Plaintiff's "Ready Now" was Benson's claim to the internal investigator in April 2016 (five months after the promotion and following Plaintiff's internal complaint of gender discrimination) "that he told Alleva that he disagreed with Alleva's 'ready now' rating of Pittman during a one-on-one meeting (between 6-12 months before the candidate slate was put together)." Doc. 24-14 at 91; Doc. 24-13 at 101. In his deposition, Benson claimed that the change in Plaintiff's "Ready Now" status either took place during the May 28, 2015 succession planning meeting or "a supply chain leadership team meeting" on an unspecified date. (Doc. 24-3 at 97). Later in his deposition, Benson states that the change must have been decided in a supply chain leadership meeting. Doc. 24-3 at 115-116. Benson's human resource partner, Scott Montemurno, contradicted Benson, stating that the last time that the rating could have been changed was in the late May/early June succession planning meeting. Doc. 24-9 at 125. In deposition, Benson contradicted his previous account by claiming that the discussion was not one-on-one with Alleva, but that instead eight to ten people took part in the discussion. Doc. 24-3 at 116. Despite the formalized and documented fashion in which Plaintiff's initial "Ready Now" status was established, no note, PowerPoint slide, email, or other document has ever reflected any supposed change to Plaintiff's status.

It is obvious from the review of the various inconsistent accounts that Defendant's management officials have not been truthful. There is simply no way that Plaintiff's status could have been changed in the fashion claimed by Defendant. The fact is that Plaintiff was evaluated as "Ready Now" for the promotion, while the person eventually promoted was not.

**III.    CONTINUOUSLY SHIFTING REASONS FOR NOT SELECTING PLAINTIFF**

Prior to complaining of discrimination, Plaintiff was provided only one reason for non-promotion: she was told that she had no outside-Vistakon experience in November 2015. Defendant's justifications have shifted and changed as the first two reason became increasingly untenable.

Before addressing the shifting reasons, however, it is important to note that, outside of Montemurno's alleged examination of Plaintiff's "Ready Now" designation on her talent card, no documentation reflects that any evaluation of Plaintiff's qualifications was conducted during the time she was being purportedly considered for an interview for the Position. Other than an email stating that Plaintiff was interested in the job, a reply from Benson that he would "consider" her, and a third email from Montemurno stating that Plaintiff "doesn't have a real chance," no documents were provided to suggest that Defendant ever evaluated Plaintiff. *See* Doc. 24-11 at 111-112; Doc. 24-12 at 85; Doc. 24-3 at 137; Doc. 24-4 at 50; Doc. 24-9 at 63; Doc. 24-10 at 40. Montemurno told Defendant's internal investigator that he knew nothing about Plaintiff other than what was on her "talent card," since he had only been in the role for two months at the time. Doc. 24-13 at 57; Doc. 24-14 at 38. Benson testified that he was unaware of Plaintiff's specific accomplishments, and relied on her supervisor Mike Alleva to provide details. Doc. 24-3 at 126. Absolutely no documents, notes, or emails exist to show that any review of Plaintiff's background or accomplishments was made during the brief time she was being considered for the Position. No person testified to having provided any information about Pittman, and no decision-maker identified any information received from any other individual. Without any evidence that an evaluation or comparison occurred, Defendant's claims of a supposed qualifications evaluation or comparison are without support.

**Outside Experience.**

The initial justification for Plaintiff's non-promotion was Benson's statement to Plaintiff on November 10, 2015 that she was not selected because she lacked experience outside of the Johnson & Johnson Vision Care division. Doc. 24-11 at 116-119; Doc. 24-12 at 86. No "outside experience" requirement appears in the position description. Doc. 24-14 at 16-19. In fact, Plaintiff did have outside experience, which Benson acknowledged during his deposition. Doc. 24-3 at 76-77. When Plaintiff learned that a male peer, Ronnie Hawthorne, who had no experience outside of Vision Care (Doc. 24-3 at 78) had been selected for an interview, she made an internal complaint of gender discrimination. Doc. 24-8 at 1; Doc. 24-11 at 21.

Defendant now claims that the "outside experience" criterion meant more than work outside of Vistakon, and claims that Benson wanted someone with "diverse experiences at high levels in the recent past." Doc. 21 at 12. The recent expansion of the supposed "outside experience" criterion conflicts with Benson's description in the April/May 2016 internal investigation report, in which Benson made no mention of any requirement that the "outside experience" be "high level." Doc. 24-14 at 71. Further, Benson's supposed criterion simply makes no sense, given Benson's acknowledgment that male candidate Hawthorne was considered and interviewed, despite having no outside experience at any level, or at any point in his career. Doc. 24-3 at 77-78. Apparently recognizing the patent invalidity of the criterion, Benson denied that he ever told Plaintiff that she was disqualified for an interview because of lack of outside experience. Doc. 24-3 at 76-77.

**Benson's Supposed Development of Alternate Criteria**

The formal description of the Position is four pages in length, and outlines in great detail the

qualifications the Position. Doc. 24-14 at 11. According to Benson, the position description defines the core requirements of the job, and is used to develop the success criteria for the Position and then both are used to evaluate individual resumes of applicants. Doc. 24-3 at 71-72.

Defendant contends that Benson created alternate criteria, which should take precedence over the formalized "succession planning" process or the established position description. Doc. 21 at 11-12. Benson's set of alternate criteria, however, were never applied to disqualify Plaintiff for the Position. Instead, Benson's supposed alternative criteria appear only after he narrowed the list of candidates for the Position. Doc. 24-4 at 51. Benson presented his alternate criteria for the first time in an email to the persons who were scheduled to interview the three male finalists, but he did so only *after* Plaintiff was excluded from consideration. *Id*. The first mention of the alternative criteria, upon which Defendant relies, is in a November 6, 2015 email identifying the following areas that should be addressed during the interviews:

- Strong Supply Chain background
- Strong NPI and Innovation experience
- Outstanding collaborator
- Ability to work effectively at board/ leadership team level
- Talent development position- someone who will "move on and up" in J&J SC

*Id*. Benson appears to have identified his alternate criteria for the Position only after he narrowed the slate of candidates. The qualifications listed in the position description (Doc. 24-14 at 16-19) were the only criteria in existence at the time Defendant denied Plaintiff consideration for the position. Nothing from the position description was ever utilized to claim that Plaintiff was not qualified for the Position.

**Criteria in September 2018**

During his September 2018 deposition, Benson claimed that Plaintiff was not promoted because she lacked "[p]otential to move on and up in J&J supply chain," "experience outside of Vision Care," "relevant [high]-level experience; and "broad supply chain experience." Doc. 24-3 at 82. Defendant does not attempt to use the "move on and up" potential in its motion, likely because it is neither well-explained or justifiable.[2] As addressed above, Plaintiff did have experience outside Vision Care, and the "high level" experience is addressed below. As to lack of "broad supply chain experience," Defendant does not appear to rely upon this criterion, and Plaintiff's resume reveals over thirty years of experience in supply chain management, in a number of various positions, including: planning; manufacturing; plant management; engineering; packaging; quality assurance; warehouse management; new products; new technology start-ups; product end-of-life management. Doc. 24-12 at 38; Doc. 24-15.

**Board Level Ability/Experience.**

Defendant now contends that Plaintiff was not selected because she "lacked experience leading innovation at the senior board level and highest leadership level within an organization and was not a strong collaborator.[3] " Doc. 21 at 11. The criterion announced during the promotion process (after Plaintiff was rejected) on November 5, 2015 was: "Ability to work effectively at board/ leadership team level." Doc. 24-4 at 51. Defendant's new version of the criterion require

---

[2] In fact, Scott Montemurno, who was Benson's HR partner for the process, testified that he had no information regarding Plaintiff's plans or ability to move up or continue with the company. Doc. 24-9 at 98-99. Montemurno's deposition testimony conflicts with what he told Defendant's internal investigator, in which he relayed a discussion with Benson characterizing Plaintiff as a "blocker" who would refuse to leave Jacksonville. Doc. 24-13 at 54-55.

[3] The "strong collaborator" assertion is addressed below.

s more than "ability" to work at the board level, and instead requires specific experience. Nevertheless, the record contains ample evidence that Plaintiff met each reiteration.

Benson testified that he wanted Plaintiff to accept a Planning Director role in the summer of 2015. Doc. 24-3 at 109. Benson believed that the role for which he wanted Plaintiff to apply in the summer of 2015 should have been classified at a vice president level (V1), rather than a director (D2) level. Doc. 24-3 at 109-110. The Planning Director position would have required board-level interaction. Doc. 24-3 at 110-111. Benson's testimony leaves no doubt that he deemed Plaintiff capable of working at the board level, since he wanted Plaintiff to take a position requiring board-level work.

To the extent that Defendant now claims that Plaintiff needed board-level experience rather than board-level ability, Benson's deposition testimony directly refutes the claim that Plaintiff lacked such experience. Benson explained that he was not aware of Plaintiff's board experience, and would have relied upon her supervisor's assessment during the succession planning process to give him information about her board-level work, "[b]ut she would have had occasional meetings at the board level, absolutely".[4] Doc. 24-3 at 125. Benson testified that he didn't have specific knowledge of Plaintiff's board-level projects, but:

> . . .she would have been certainly guiding, leading, and shepherding key new product introductions that would have required exposure at the board level. Particularly at that time, I think it was ["B]eauty.

*Id*. Benson then admitted that Plaintiff had been involved in various board-level projects, in which

---

[4] As explained above, there is substantial evidence to support the conclusion that Plaintiff was rated fully "Ready Now," and that no reservations about her ability to perform the duties of the Position were expressed during succession planning.

she worked directly with board members.  Doc. 24-3 at 126-129.

**Collaboration and Leadership**

Defendant now asserts that Plaintiff is somehow weak in "collaboration." Doc. 21 at 11.  The only discussion of any "collaboration" issue appears in Benson's discussion of the alleged reasons that he and the team changed Plaintiff's "Ready Now" status (which, as stated above, nobody else seems to recall, and appears to have never happened).  Doc. 24-3 at 103-104. Benson never testified that "collaboration" was a factor in Plaintiff's non-promotion.  Neither the internal investigation (Doc. 24-14 at 69) nor the EEOC position statement (Doc. 24-8 at 47) ever alleged that Plaintiff was not promoted based on any supposed deficiency in "collaboration," and such supposed deficiency was never documented elsewhere.  Contrary to the recent assertion regarding "collaboration" deficiency, Defendant's "Credo Survey" results rank Plaintiff in the 90th percentile in "collaboration."  Doc. 24-15 at 7; Doc. 24-2 at 7.  Indeed, Plaintiff's Credo survey rankings were stronger than either of the two internal candidates (Conroy and Hawthorne) who were interviewed for the Position.  Doc. 24-3 at 134.[5]

Defendant repeatedly asserts that Plaintiff 's rating of "fully meets" rather than "exceeds" in leadership on her performance evaluation supports the decision not to interview her for the Position and her subsequent non-promotion. Doc. 21 at 3, 10, 11, 12 and 15.  There is no evidence that the decision-makers, Benson and Montemurno reviewed Plaintiff's performance review before making the decision to exclude her. Nevertheless, Defendant emphasizes the differences in ratings

---

[5] Defendant's human resources representative (head of HR for J&J Acquisitions and Divestures Integration Management Office) Christy MacLeod testified that Credo scores evaluate various leadership factors.  Doc. 24-7 at 26-27.

between Conroy and Plaintiff, and even asserts that the "fully meets" rating somehow supports a conclusion that Plaintiff was not "a strong collaborator." *Id*., at 15. Benson testified in deposition that a rating of "fully meets" or "exceeds" in leadership was never considered in developing the slate of candidates for the Position. Doc. 24-3 at 99. When asked how any of the candidates placed on the slate would have rated on the leadership evaluation factor, Benson stated that he did not know. *Id.* Specifically, Benson testified:

> Q   Did you ever consider [the leadership rating] in determining whether or not they were put on the slate?
> A   Not specifically. There wouldn't be a rigorous appraisal against that.
> Q   So that wouldn't really be something that would prevent somebody from being placed on a slate?
> A   No.

Doc. 24-3 at 99. The record reflects that Benson had no idea of the leadership ratings for either Conroy or Pittman, and that the rating was never considered.[6]

Due to the fact that Defendant did not rely on the criteria it professes to disqualify Plaintiff during the interview and hiring process, Defendant's continued emphasis on the "leadership rating" of "fully meets" is completely without merit, and Defendant's continued emphasis on the meritless argument underscores the fully pretextual nature of its arguments.

**Other Evidence that Defendant's Stated Criteria are Not Worthy of Credence**

Defendant urges that James Conroy was legitimately promoted, based on supposedly valid non-discriminatory criteria. In addition to the substantial evidence of pretext listed above, the

---

[6] Instead, Benson testified that employees regularly move back and forth between "exceeds" and "fully meets;" suggested a weakness in the appraisal system's distinction between the two ratings; and explained that is was extremely rare for an employee to receive an "exceeds" rating in both performance an leadership. Doc. 24-7 at 26-27.

treatment of other candidates establishes that the promotional process was not legitimate. The human resources official who worked with Benson testified that outside candidate Quincy Troupe was a viable candidate for the Position. Doc. 24-9 at 57. Troupe, however, didn't even meet the basic qualifications, since he had none of the medical device experience required by the position description. Doc. 24-3 at 147-148; Doc. 24-14 at 16-19. Benson conceded that Hawthorne did not meet several of the criteria but was interviewed anyway. Doc. 24-3 at 78-82. Benson even classified Hawthorne's interview as "almost a token gesture." Doc. 24-3 at 79.

After admitting that Hawthorne did not meet the success criteria for the Position, Benson conceded that Troupe was even less qualified than Hawthorne for the Position. Doc. 24-5 at 34. Montemurno told the internal investigator that Troupe was rated low because he lacked experience with new product introduction. Doc. 24-13 at 94. The specific reasons for Troupe's low ratings were matters that could be clearly identified by simply reviewing his resume. *See* Doc. 24-10 at 54-55. It is not difficult to predict that an individual who works for a soup company may have difficulty meeting the requirements for a medical device supply chain vice presidency.

Defendant insists that it was making legitimate decisions about candidate qualifications when it excluded Plaintiff from interviewing and promotion (after deeming her "Ready Now" a few months earlier), but Defendant's decisions to interview two male candidates whom it now concedes were unqualified certainly undermines its business judgment.

## IV.   COMPARISON OF QUALIFICATIONS

The record reflects that the two decision-makers, Benson and Montemurno did not actually engage in any substantive comparison of the candidates' qualifications before declining to interview

her for the Position. Benson admits that he was not familiar with Plaintiff's qualifications. Doc. 24-3 at 125-126. Montemurno testified that he looked at Plaintiff's talent card and saw that she had a "Ready Now" rating for the Position, but he did not identify any other information he may have reviewed. Doc. 24-9 at 45. In contrast, Benson testified that he would not have even reviewed Conroy's talent card or other information prior to the interview process, by which time Plaintiff had already been eliminated. Doc. 24-3 at 154-155. Based on these facts, it would have been impossible for the decision-makers to have performed any real comparison between the qualifications of Conroy and Plaintiff. Further, however, the record does not support the claim that Conroy was more qualified than Plaintiff.

Defendant provides no support for its claim that Plaintiff was less qualified than Conroy because she lacked "experience leading innovation at the senior board level and highest leadership level within an organization." [Doc. 21 at 11-12]. Defendant makes the conclusory statement that Conroy "had the requisite innovation experience leading R&D" *id.* and points this Court to a single project on which Conroy worked with Benson. [Doc. 21 at 11][7] There is no record evidence that the single-cited project was "at the senior board level and highest leadership level within an organization." In contrast, Plaintiff worked on a number of innovative board-level projects. Doc. 24-

---

[7] Defendant seems to suggest that Conroy's experience in packaging and labeling was superior to Plaintiff's. Doc. 21 at 11. Plaintiff's supervisor testified that the management team, under Plaintiff, collaborated with R&D in packaging development. Doc. 24-1 at 31-32. Plaintiff's resume reveals packaging and labeling experience, and her declaration reflects such experience. When Benson was asked about Conroy's packaging and labeling experience, he stated that Conroy had overseen those areas (Doc. 24-3 at 157) but he never was questioned as to whether Plaintiff had the same skills as a result of her supervision as a director. No evidence exists to show that "packaging and labeling" experience were compared, or that the factor was considered in making the decision.

3 at 125-129; Doc. 24-15. Clearly, Plaintiff is at least as qualified as Conroy in this area.

Next, Defendant cites Plaintiff's allegedly poor collaboration skills as a distinction between her and Conroy's qualification. Defendant references no support in concluding that Conroy's "collaboration" skills were somehow superior to Plaintiff's and, as stated above, Plaintiff's superior Credo survey results establish the contrary conclusion.[8]

Defendant further compares Conroy's outside-Vistakon experience with Plaintiff's. As noted above, the alleged "outside-Vistakon" requirement appears nowhere in the position description, and when Benson first articulated his alternate criteria, he never mentioned it. Doc. 24-4 at 51. His first mention of the criterion was when he informed Plaintiff that she had been disqualified for no outside experience, when she in fact had worked outside the company (Doc. 24-11 at 116-119; Doc. 24-12 at 86), immediately before Benson interviewed a male peer who had absolutely no outside experience. As explained above, the "outside experience" alleged criterion, while never formally identified (not even in the April/May 2016 internal investigation report) has shifted and changed. At no time prior to Plaintiff's claim of discrimination, did Benson suggest that a candidate need more than a threshold level of external experience. Further, while Benson claimed that Conroy had greater external experience, there is no testimony or evidence that this single factor weighed more heavily than the other factors on which the evidence shows Plaintiff was equally or greater qualified.

V.     **LEGAL ARGUMENT**

Defendant's recitation of the *prima facie* case for promotional discrimination (Doc. 21 at 14)

---

[8] Defendant further refers to various "pipelines," for candidates, but fails to explain the relevance of such pipelines (Doc. 21 at 8, 9, 11) or why a legitimate "Ready Now" candidate would not have been considered to be in such "pipeline."

is erroneous.[9] To prevail in such a claim, a plaintiff may establish a prima facie case of discrimination by showing: (1) [s]he was a member of a protected class; (2) [s]he sought and was qualified for a promotion; (3) despite h[er] qualifications [s]he was rejected; and (4) after h[er] rejection, h[er] employer either continued to attempt to fill the positions or in fact filled the positions with persons outside of h[er] protected class. *Voudy v. Sheriff of Broward Cty. Fla.*, 701 F. App'x 865, 869 (11th Cir. 2017). There is no dispute that Plaintiff is a member of a protected class, that she sought a promotion, that she was rejected, and that the position was filled with persons outside her protected class. However, Defendant contends that Plaintiff was not qualified for the promotion.

Plaintiff was clearly qualified for the promotion since she met the objective criteria for the job contained in the Position description and was rated "Ready Now" for the Position. An employee is "qualified for a promotion if the employee offers evidence that 'she satisfied an employer's objective qualifications.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1204 (11th Cir. 2013) (*quoting Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005)). "But where the qualifications for the job are neither objectively verifiable nor easily obtainable or within the plaintiff's possession, the plaintiff need not satisfy this portion of the prima facie case." *Id.* (internal

---

[9] Contrary to Defendant's assertion, the prima facie case does not require proof that a plaintiff is more qualified than the person selected. *See Walker v. Mortham*, 158 F.3d 1177, 1185-87 (11th Cir. 1998) (resolving intra-circuit split, and finding that fourth element requires no evaluation of relative qualifications). The Eleventh Circuit, citing *Walker,* recently found error in a district court's inclusion of "other equally or less qualified employees outside of the protected class were promoted" in the *prima facie* case. *Voudy v. Sheriff of Broward Cty. Fla.*, 701 F. App'x 865, 868-69 (11th Cir. 2017).

citations and quotations omitted).  To the extent that Defendant claims that Plaintiff somehow failed to meet the repeatedly revised, reformulated and unclear subjective factors which Defendant claims to support her rejection after the fact, such factors do not meet the standard required in *Kidd* , and are insufficient to prevent Plaintiff from making a *prima facie* showing.

Once the employee has established a *prima facie* case of disparate treatment, the burden of production, but not of persuasion, shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Vessels*, 408 F.3d at 770-71. This burden involves no credibility determination and is "exceedingly light," but it does require the employer to articulate a "clear and reasonably specific" non-discriminatory basis for its decision. Id. at 770 (quoting *Tex. Dep. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)).  It is far from clear whether Defendant JJVC even met the "exceedingly light" standard, but assuming that such standard was articulated, Plaintiff is entitled to rebut the allegedly non-discriminatory basis by bringing evidence that shows Defendant's alleged non-discriminatory reason is merely pretext. To show pretext, Plaintiff may reveal "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

An employer's 'inconsistent post-hoc explanations" for not promoting a candidate can support a finding of pretext in a gender discrimination case. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639 (4th Cir. 2002); *see also Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 935 (11th Cir. 1995)(finding that pretext may be demonstrated through "shifting explanations"); *Tidwell*

*v. Carter Prods*., 135 F.3d 1422, 1428 (11th Cir. 1998) ("identification of inconsistencies in an employer's testimony can be evidence of pretext.") Defendant's justifications for Plaintiff's non-promotion were each created after Defendant decided to not include Plaintiff on a slate of candidates for interview.  Indeed, at the time that she was excluded from the list, the only criteria for promotion articulated were the criteria that made her "Ready Now" for the position, and which rendered the eventual male selectee not "Ready Now."  On November 6, 2015, after the decision to exclude Plaintiff had been made, Benson developed a set of criteria for interviews of the three finalists.  Doc. 24-4 at 51.  The record is therefore devoid of any evidence that Defendant ever considered any of those factors in determining that Plaintiff was not qualified or less qualified for the position, or that Defendant compared her qualifications to that of Conroy or the other finalists during their interview and hiring process.

Defendant spends a large portion of its brief trying to explain why Plaintiff's not actually "Ready Now" for the Position.  Doc. 21, 4-7.  As discussed above, Defendant's explanations and assertions regarding Plaintiff's "Ready Now" status are simply impossible to reconcile. Benson has provided at least three different stories as to how Plaintiff's "Ready Now" status was downgraded (in a "one-on-one" discussion with Alleva, in the succession planning meeting, and in a supply chain leadership meeting), before concluding that it must have been decided in a supply chain leadership meeting.  Benson's HR partner, Montemurno contradicts him, stating that such a change could only have taken place in a succession planning meeting.  Plaintiff's supervisor, Alleva, first denies any meetings when he is interviewed in April 2017, and states that Plaintiff was rated "Ready Now." A few weeks later, he revises his story, and said that Plaintiff was not truly "Ready Now," but provides

no detail as to any supposed change in the rating. He then completely changes the story in his 2018 deposition, claiming that he fully remembers a discussion changing her rating in the May 2015 succession planning meeting. Any claim that Plaintiff's rating was changed is refuted by the documentary evidence, including her talent cards, notes of contemporaneous conversations with Alleva regarging the rating, and Alleva's own talent card. No document exists to support Benson's claim that the rating had changed, although extensive documents to the contrary exist. Finally, there is no logical explanation as to why some member of management would not have raised the alleged change in "Ready Now" status during the promotional process or the various discussions with Plaintiff as to her application.

No greater evidence of pretext could exist than when a decision-maker makes obviously false assertions regarding a key issue. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194-95 (11th Cir. 2004) ("shifting reasons allow the jury to question [decision-maker's] credibility"); *Holland v. Gee*, 677 F.3d 1047, 1063 (11th Cir. 2012)(decision makers' denial that he knew of the plaintiff's pregnancy was contradicted by the person who allegedly informed him of it, and "could have been the basis for the jury to make an adverse credibility determination as to [the decision-maker] and thus further supported the finding of discrimination.") Defendant's claims regarding the "Ready Now" status are simply unbelievable. If Defendant is willing to provide false stories about rating Plaintiff as ready for the promotion under its promotional evaluation process, a jury is certainly able to conclude that it is lying about the other reasons for the non-promotion. Evidence of pretext as to one of a defendant's supposed legitimate non-discriminatory reasons can be sufficiently strong, especially when it involves dishonesty by a decision-maker or an intertwining

of alleged reasons, to allow a factfinder to conclude that Defendant lacks all credibility as to other proffered reasons. *Tucker v. Hous. Auth.*, 507 F. Supp. 2d 1240, 1260 n.20 (N.D. Ala. 2006), aff'd, 229 F. App'x 820 (11th Cir. 2007) (per curiam)(recognizing exception to general rule in *Chapman v. A.I. Transport*, 229 F.3d 1012, 1050-51 (11th Cir. 2000) that a plaintiff must defeat all proffered justifications). In this case, Plaintiff was the only "Ready Now" candidate for the position who was not interviewed, and the male "Ready Now" candidate was granted an opportunity to interview for the position. Indeed, the very reason given to her by Benson for not receiving an interview (no outside experience) was false, and the male "Ready Now" candidate was permitted an interview, when he, in fact, lacked any outside experience.

Defendant's after-the-fact selection of specific criteria is evidence of pretext. An "employer asked to justify its actions after the fact has an incentive to claim that the 'real' criteria were those on which the chosen employee happens to perform best relative to the plaintiff. When an employer picks one of a list of posted job qualifications and claims that it was actually decisive without regard to the others, the jury is certainly permitted to conclude, in light of the totality of the evidence, that this may have been done as a post hoc justification of a decision made on other grounds." Dennis, 290 F.3d at 646 n.2. Focusing the Court's attention on a limited number of justifications that didn't exist until after Conroy's promotion, while asking the Court to disregard all of the previously-asserted reasons, is simply Plaintiff's attempt to reinvent history and is pretextual.

Defendant claims that it made its promotional decision based on a comparison of the candidates, and a determination that James Conroy was the most qualified. Such an assertion is undermined by the decision-maker's concession that he never reviewed the qualifications of the

candidates before making his decision. It is also undermined by the lack of supporting evidence that Conroy met the requirements of the position, or even the continually changing revised qualifications that Defendant appears to have created when the previous sets no longer appeared legitimate.

While Plaintiff need not present evidence other than evidence of pretext in order for summary judgment to be denied, other evidence of gender discrimination is contained in the record. The evidence reflects that the only "Ready Now" candidate to be denied serious consideration and an interview was a woman. The male "Ready Now" candidate was granted an interview, despite his complete lack of outside experience, while the female candidate was denied an interview when she actually possessed such experience. The succession planning documents reflect that the supply chain organization in question had no women at the vice president level. Doc. 24-2 at 52.

While Defendant claims that two other females were considered for the promotion at issue, the evidence suggests that they were never seriously evaluated. As to an external female candidate, Barbara Mooney, Benson testified that he would have reviewed her resume and taken notes of conversations with persons familiar with her, since she was an external candidate. Doc. 24-3 at 152-153. Defendant produced all documents relating to the promotional process, and no resume or note for Mooney was ever provided. No documentation other than a talent card was produced regarding the other female candidate, Denise Fuzak, who apparently had only been rated "Ready Now" for lower level director positions. Doc. 24-9 at 48-49.

For the reasons cited herein, Plaintiff states that she has presented a prima facie case, and has presented substantial evidence of pretext, sufficient to present a jury question. The summary judgment motion should therefore be denied.

Respectfully submitted this 15th day of February, 2019.

**DELEGAL LAW OFFICES, P.A.**

/s/ T.A. "Tad" Delegal, III
**T.A. "Tad" Delegal, III**
Fla. Bar No.: 892701
**James C. Poindexter**
Florida Bar No.: 0116039
424 East Monroe Street
Jacksonville, FL 32202
Telephone No.: (904) 633-5000
Facsimile No.: (904) 358-2850
Email: tad@delegal.net
Email: james@delegal.net
Secondary Email: office@delegal.net
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of February, 2019, I filed the forgoing via this Court's CM/ECF filing system, which will serve the foregoing on the following registered users electronically by email:

Anthony J. Hall, Esquire
Email: ajhall@littler.com
Kimberly J. Doud, Esquire
Email: kdoud@littler.com
LITTLER Mendelson, P.C.
111 North Magnolia Avenue, Suite 1250
Orlando, FL 32801-2366
Attorneys for Defendant

_____/s/ Tad Delegal_____
Tad Delegal