UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARY ANN PITTMAN,

       Plaintiff,

v.                                                          CASE NO. 3:17-cv-645-J-34JBT

JOHNSON & JOHNSON
VISION CARE, INC.,

       Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion for Summary

Judgment ("Motion") (Doc. 21), Plaintiff's Response thereto (Doc. 25), Defendant's

Reply (Doc. 30), and Plaintiff's Sur-Reply (Doc. 31).[2] The Motion was referred to the

undersigned for a Report and Recommendation regarding an appropriate resolution.

(Doc. 33.)   For the reasons set forth herein, the undersigned respectfully

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

[2] In its Order denying Plaintiff's Motion to Strike Defendant's Reply or in the Alternative for Leave to File Sur-Reply (Doc. 31), the Court stated that it "considers the arguments set forth in this Motion as Plaintiff's sur-reply to Defendant's reply." (Doc. 32 at 2.)

**RECOMMENDS** that the Motion be **GRANTED**, and that final judgment be entered in favor of Defendant and against Plaintiff.

## I.    Background

Plaintiff is a current employee of Defendant who has been employed by Johnson & Johnson in various positions since being hired in 1983.  (Doc. 1 at 3; Doc. 22-2 at 148.)[3]  In 2015, the Vice President of Product Management (Vistakon) position ("Position") became available in Jacksonville and Plaintiff expressed an interest in it.[4]  (Doc. 1 at 3–4.)  Plaintiff was told that she would be considered.  (*Id.* at 4.)  Defendant considered at least 13 candidates, including Plaintiff and two other females.  (Doc. 24-3 at 102, 131–32, 149–51; Doc. 22-2 at 114–15; Doc. 24-10 at 40.)  Plaintiff was not interviewed.  (Doc. 1 at 4.)  Rather, Defendant interviewed three men, one of whom was ultimately selected.  (*Id.*; Doc. 22-2 at 114; Doc. 24-3 at 77–78; Doc. 24-9 at 51–52, 63.)  Plaintiff filed the instant action bringing claims for gender discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") ("Count I") and the Florida Civil Rights Act, Chapter 760, Florida Statutes ("FCRA") ("Count II") based on Defendant's failure to promote her. (Doc. 1.)  Defendant now moves for summary judgment on both counts.  (Doc. 21.)

---

[3] All citations reflect the pagination generated by CM/ECF, not the internal pagination of the documents.

[4] Johnson & Johnson is made up of separate businesses, including Vision Care (the defendant in this case) and Diabetes Care.  (Doc. 24-3 at 6.)  Vistakon is a division of Vision Care.  (Doc. 24-11 at 40.)

2

## II.   Legal Principles

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own

3

affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## B.   Employment Discrimination

Title VII and the FCRA prohibit, among other things, employment discrimination on the basis of sex. *See* 42 U.S.C. § 2000e-2(a)(1); Fla. Stat. § 760.10(1)(a). As the Eleventh Circuit has stated:

> In cases where direct evidence of employment discrimination is lacking, we analyze the claim under the *McDonnell Douglas*[5] framework, which requires the plaintiff to create an inference of discrimination through her *prima facie* case. Once the plaintiff has made out the elements of the *prima facie* case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action. If the employer meets this burden, the plaintiff must show that the proffered reasons were

---

[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> pretextual. The ultimate burden of persuading the trier of
> fact that the defendant intentionally discriminated against
> the plaintiff remains at all times with the plaintiff.

*Springer v. Convergys Customer Mgt. Grp. Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (footnote and citations omitted). "Claims under Title VII and the FCRA are analyzed under the same burden-shifting framework."[6] *Gamboa v. American Airlines*, 170 F. App'x 610, 612 (11th Cir. 2006).[7]

### III. Analysis

#### A. Defendant's Selection Process

Although multiple persons were involved, Mark Benson, Vice President of Customer and Logistics Services and Consumer Medical Devices Supply Chain, had the final hiring authority for the Position. (Doc. 24-3 at 6–7, 15–16.) Given the high-level nature of the Position, Defendant did not post the Position or solicit applications. (Doc. 24-9 at 21.) Rather, it relied on input from various people, including human resources personnel, colleagues, stakeholders, and those expressing an interest in the Position, to determine potentially viable internal and

---

[6] The parties agree that the *McDonnell Douglas* framework applies in this case, and that Plaintiff's claims should be addressed collectively under that framework. (*See* Doc. 21 at 14–15; Doc. 25 at 14–16.)

[7] Although unpublished Eleventh Circuit decisions are not binding precedent, they may be persuasive authority on a particular point. *See, e.g.*, *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive."). Rule 32.1 of the Federal Rules of Appellate Procedure expressly allows citation to federal judicial unpublished dispositions that have been issued on or after January 1, 2007. Fed. R. App. P. 32.1(a).

external candidates.  (*Id.* at 22–24; Doc. 24-3 at 22–24.)  There was brainstorming and conversations among numerous people in an effort to get the best talent for the job.  (*Id.*)  Candidates were discussed on a rolling basis and competitive candidates were placed on a "slate," which was constantly changing, to determine potential interviewees.  (Doc. 24-3 at 59–60, 102, 141–43.)

Defendant began the process of putting together a slate on September 30, 2015, and a preliminary slate was created on October 2, 2015.  (Doc. 24-10 at 18–19.)  However, Plaintiff did not indicate to Mr. Benson that she was interested in the Position until October 30, 2015.  (Doc. 22-2 at 111–13; Doc. 22-3 at 7.)  Plaintiff was informed by Mr. Benson that she would be given full consideration.  (Doc. 22-3 at 7.)  Scott Montemurno, the global head of talent acquisition and talent mobility for Defendant, testified that Plaintiff was not discussed as a potential candidate until she expressed her interest to Mr. Benson.  (Doc. 24-9 at 6, 46.)  By November 2, 2015, two interviewees had already been selected, and interviews were scheduled to begin the following week.  (Doc. 24-10 at 40.)

Mr. Benson did not engage in extensive review of documents regarding candidates until after interviewees were selected because it would be too time consuming.  (Doc. 24-3 at 61–62, 72–73, 154–55.)  This was particularly true for internal candidates, such as Plaintiff, with whom Defendant was already familiar.  (*Id.*)  Rather, due to the strength of the competition, before interviewees were selected candidates were narrowed down quickly based on many factors.  (*Id.* at

147.)  The criteria used to evaluate candidates came from the job description and certain key criteria, known as "success criteria."[8]  (*Id.* at 23–24; Doc. 24-14 at 16–19; Doc. 24-4 at 51.)  However, exceptions to the criteria could be made because it was rare to find a candidate who met every single one.  (Doc. 24-3 at 71.)

Defendant considered at least 13 candidates, including Plaintiff, for the Position, but may have considered as many as 20 or 25.  (*Id.* at 102, 131–32; Doc. 22-2 at 114–15; Doc. 24-10 at 40.)  Mr. Benson had multiple conversations with Mr. Montemurno about Plaintiff.  (Doc. 24-3 at 102.)  Mr. Benson testified that Plaintiff was placed on the slate at one point.  (*Id.*; Doc. 24-10 at 40.)  Mr. Montemurno noted in an email dated November 2, 2015 that they were considering Plaintiff along with two interviewees.  (Doc. 24-10 at 40.)  However, Mr. Montemurno did not "think she has a real chance against the other 2."  (*Id.*)

At least two candidates other than Plaintiff were females.  (Doc. 24-3 at 149–51.)  Defendant initially intended to interview one internal candidate (James Conroy) and one external candidate (Quincy Troupe).  (*Id.* at 147–48; Doc. 24-4 at 51; Doc. 24-10 at 40.)  However, Mr. Benson was pressured by Valerie Love, the Vice President of Human Resources for Division Care Franchise, to also interview a candidate from Jacksonville. (Doc. 24-3 at 77–79; Doc. 24-9 at 72–73.)  Ms. Love

---

[8] These criteria were: "Strong Supply Chain background; Strong NPI [New Product Introduction] and Innovation experience; Outstanding collaborator; Ability to work effectively at board/leadership team level; [and] Talent development position – someone who will 'move on and up' in J&J SC [Johnson & Johnson Supply Chain]."  (Doc. 24-4 at 51.)

recommended Ronnie Hawthorne and Chuck Medovich.  (Doc. 24-3 at 77–79, 101; Doc. 24-9 at 72–73.)  Although Plaintiff lived in Jacksonville, Mr. Benson did not think that Ms. Love recommended Plaintiff.  (Doc. 24-3 at 79, 101.)

As a courtesy to Ms. Love, Mr. Benson chose to interview the Jacksonville candidate he considered most qualified (Ronnie Hawthorne), resulting in a total of three interviewees, all of whom were male. (*Id.* at 77–79; Doc. 24-9 at 51–52, 102.)  Following the interview process, Defendant determined that Mr. Conroy was the most qualified, and he was selected.  (Doc. 24-3 at 65; Doc. 24-9 at 103, 119.)  Mr. Benson called Plaintiff and informed her that she was not selected because, among other things, she lacked high-level experience outside of Johnson & Johnson Vision Care ("Vision Care").[9]  (Doc. 24-3 at 75–77; Doc. 22-2 at 119.)

### B.    Plaintiff's Prima Facie Case

"To state a prima facie case [for failure to promote], the plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified and applied for the promotion; (3) he was rejected despite his qualifications; and (4) the position was filled with an individual outside the protected class."  *See Holmes v. Alabama Bd. of Pardons & Paroles*, 591 F. App'x 737, 742 (11th Cir. 2014).  The parties disagree about whether the fourth element also requires Plaintiff "to show that the promoted

---

[9] Because Johnson & Johnson is made up of separate businesses, Defendant's references to "outside experience" do not necessarily mean experience outside of Johnson & Johnson, but rather outside of the Vision Care business where the Position was located. (*See* Doc. 24-3 at 75–76, 141–42.)

employee was equally or less qualified," and the Eleventh Circuit recognizes that it has issued conflicting opinions on this issue. *See id.* (*See also* Doc. 21 at 14; Doc. 25 at 14–15; Doc. 30 at 1–2.) Given the uncertain state of the law and the undersigned's ultimate recommendation that the Motion be granted, the undersigned recommends that the Court assume, without deciding, that Plaintiff has satisfied her prima facie case.

### C.      Defendant's Reason for not  Promoting Plaintiff

Defendant's burden at this stage to provide a legitimate, non-discriminatory reason for not promoting Plaintiff is "exceedingly light." *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1312 (11th Cir. 2016). In fact, the Court "need not be persuaded that the defendant was actually motivated by the reasons offered," and "[w]hether the defendant has met its burden of production . . . involve[s] no credibility assessment." *Id.* at 1312–13 (citations and quotations omitted). Defendant has articulated a legitimate, non-discriminatory reason for not promoting Plaintiff, i.e., that the candidate selected was more qualified for the Position. (Doc. 24-9 at 103.) Plaintiff does not specifically argue that Defendant has failed to carry its burden in this regard. (*See* Doc. 25 at 16.) Thus, the undersigned recommends that Defendant has carried its exceedingly light burden at this stage.

### D.      Pretext

The burden now shifts back to Plaintiff "to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by

9

[Defendant] were not the real reasons for the adverse employment decision." *See Furcron*, 843 F.3d at 1313 (quotations omitted).

As the Eleventh Circuit has stated:

> [Plaintiff] is entitled to survive summary judgment only if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action. Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext . . . . To show pretext, the evidence produced must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence. In short, [Plaintiff] must meet each proffered reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason.

*Id.* at 1313–14 (citations and quotations omitted). Further, "a reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Springer*, 509 F.3d at 1349 (quotations omitted).

Regarding failure to promote claims, the Eleventh Circuit has stated:

> In the context of a promotion, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted. . . . [A] plaintiff must show that the disparities between the successful applicant's and his own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.

*Id.* (citations and quotations omitted).  Thus, "[w]hen analyzing the issue of pretext, the [f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions."  *Johnson v. Secretary, U.S. Dept. of Veterans Affairs*, 517 F. App'x 933, 936 (11th Cir. 2013)

Plaintiff makes numerous arguments suggesting that Defendant's asserted reason for not promoting her is untruthful, inconsistent, and pretextual.[10]  For the reasons set forth below, the undersigned recommends that, even when making all reasonable inferences from the evidence in Plaintiff's favor, and considering all of Plaintiff's arguments both individually and collectively, there is no genuine issue of material fact regarding pretext.  Specifically, the undersigned recommends that the evidence does not reveal such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's proffered reason that a reasonable factfinder could find it unworthy of credence."  *See Furcron*, 843 F.3d at 1313–14.

In support of her pretext argument, Plaintiff asserts in part that she was more qualified than the candidates interviewed, including Mr. Conroy.  The undersigned recommends that Plaintiff has not even argued, much less shown, that "no reasonable person . . . could have chosen" Mr. Conroy over her.  *See Springer*, 509 F.3d at 1349.  Rather, the undersigned recommends that Plaintiff's arguments

---

[10] The undersigned has considered all of Plaintiff's arguments, including those not specifically addressed herein.

regarding qualifications essentially ask the Court to reexamine Defendant's business decision to select Mr. Conroy instead of her, which the Court should not do.

### 1.    Plaintiff's Status as "Ready Now" or "Ready Later"

First, Plaintiff argues that Defendant's purported untruthfulness regarding her "succession planning" status is evidence of pretext. (Doc. 25 at 2–4.) Defendant used a succession planning method whereby employees were categorized as, among other things, "Ready Now" or "Ready Later" for more senior positions using "talent cards." (Doc. 24-3 at 26–31.) In general, a supervisor would make a recommendation regarding an employee's succession status prior to a succession planning meeting, during which a final decision regarding the employee's succession status was reached by a group of people. (*Id.* at 79–80, 102–07; Doc. 24-1 at 86–93, 96, 103–07.)

Prior to Plaintiff expressing an interest in the Position, her supervisor, Mike Alleva, had recommended that Plaintiff be rated "Ready Now" for the Position as reflected on her talent card.[11] (*Id.*) According to Defendant, Plaintiff's status was determined to be "Ready Later" at a succession planning meeting prior to the Position becoming open. (*Id.*) However, Defendant failed to update Plaintiff's talent card, which still reflected that she was rated "Ready Now" for the Position. (*Id.*; Doc.

---

[11] Notably, Mr. Benson testified: "Mike Alleva rated most of his team ready now because he liked to give good news and it was comfortable for him to do that. But that caused some alarm in succession planning because there were a number of people that were ready now." (Doc. 24-3 at 103.)

22-3 at 4.)  Plaintiff thus argues that she was in fact rated "Ready Now" for the Position, that the candidate selected was not rated "Ready Now," and that Defendant's assertions to the contrary are untruthful and evidence of pretext.  (Doc. 25 at 2–4.)

The undersigned recommends that although there is an apparent inconsistency between Defendant's employees' testimony and its records, it does not rise to the level of creating a genuine issue of material fact regarding pretext.  First, Plaintiff concedes that a person is not guaranteed a position, or even an interview, even though the person is rated "Ready Now."  (Doc. 22-2 at 86–87.)  Mr. Benson and Mr. Montemurno testified that such designations are simply one of many factors considered, that they are not dispositive, and that those who are not rated "Ready Now" can still be considered.  (Doc. 24-3 at 62–64, 94–95; Doc. 24-9 at 44–45.)

Plaintiff notes that Mr. Conroy was not rated "Ready Now" for the Position (Vice President of Product Management (Vistakon)).  (Doc. 25 at 17.)  However, Mr. Conroy was rated "Ready Now" for a comparable position (Vice President of Product Management (Diabetes Care)), and the ratings for the two positions were interchangeable.  (Doc. 24-3 at 98.)  Additionally, Mr. Hawthorne, the only other internal candidate interviewed, was rated "Ready Now" for the Position, and he was not selected either.  (*Id.*)  As set forth above, the ratings were merely one of many factors considered.

Regardless of her rating, Defendant considered Plaintiff for the Position.  (*Id.* at 102; Doc. 24-10 at 40.)  As noted above, Mr. Benson had multiple conversations with Mr. Montemurno about Plaintiff.  (Doc. 24-3 at 102.)  Mr. Benson testified that Plaintiff was placed on the slate at one point, and Mr. Montemurno noted in an email that Plaintiff was being considered even after two interviewees had been selected.  (*Id.*; Doc. 24-10 at 40.)  Defendant ultimately determined that Plaintiff would not be interviewed largely because of her lack of high-level experience outside of Vision Care, not because of her succession planning status.  (Doc. 24-3 at 75–76, 80–82.)

Plaintiff also points to purported inconsistencies among statements made by Mr. Benson, Mr. Alleva, and Mr. Montemurno during Defendant's internal investigation and during depositions regarding the details surrounding Plaintiff's change in succession status.  (Doc. 25 at 2–4.)  The undersigned recommends that any such inconsistencies are minor and understandable in light of the amount of time that passed between Plaintiff's change in status and when the subject statements were made.  Thus, the undersigned recommends that any such minor inconsistencies are insufficient to create a genuine factual issue regarding pretext.  (Doc. 24-3 at 79–80, 105–07; Doc. 24-1 at 88–93, 96, 103–07.)

## 2. Lack of Documentation Showing that Defendant Considered Plaintiff for the Position

Plaintiff next argues that Defendant has failed to produce documents indicating that she was considered for the Position.  (Doc. 25 at 5.)  However, as

noted above,  Mr. Montemurno stated in an email that Plaintiff was being considered even after two interviewees had been selected.  (Doc. 24-10 at 40.)  Moreover, Plaintiff did not express an interest until very late in the process, i.e., approximately one month after Defendant began creating a slate of potential candidates, and just one week before interviews were set to begin.  (*Id.* at 18–19, 40; Doc. 22-3 at 7.)  Thus, given the time constraints, it is reasonable that Defendant would not have extensive documentation reflecting its consideration of Plaintiff.

Moreover, there was no formal application process, and Plaintiff had worked for Defendant for many years.  Mr. Benson testified that it was largely unnecessary for him to review documents regarding internal candidates, including Plaintiff, because he was familiar with their backgrounds and could obtain necessary information by talking to others in the company.[12]  (Doc. 24-3 at 61–62, 72–73, 152–55.)  *See Johnson*, 517 F. App'x at 936 ("[A]lthough an interview may be critical in evaluating a candidate's personal qualities, it may not be necessary where the decisionmaker has first-hand knowledge of the candidate.").

Rather, Mr. Benson testified that he relied on documents to a greater extent for external candidates with whom he and others in the company were not already familiar.  (Doc. 24-3 at 61–62;, 72–73, 152–55.)  Moreover, Mr. Benson testified that

---

[12] Plaintiff argues elsewhere in the Response that "Benson admits that he was not familiar with Plaintiff's qualifications."  (Doc. 25 at 13.)  However, read in context, the testimony cited by Plaintiff establishes that while Mr. Benson was generally familiar with Plaintiff and her work, he relied on others to provide specific details.  (Doc. 24-3 at 125–26.)

detailed document review for candidates did not usually occur until after candidates were selected for interviews. (*Id.* at 155.) Defendant's position is not implausible. Thus, the undersigned recommends that the purported lack of documentation regarding Plaintiff's candidacy does not create a genuine factual issue regarding pretext.

### 3.    "Shifting Reasons for not Selecting Plaintiff"

Next, Plaintiff argues that Defendant's reasons for not selecting her are largely post-hoc justifications that have shifted over time, which is indicative of pretext. (Doc. 25 at 4–11.) In doing so, Plaintiff focuses on certain individual job criteria and appears to suggest that each criteria constitutes a separate proffered reason for not promoting her. (*Id.*) However, as noted above, Defendant has offered a single reason for promoting Mr. Conroy instead of Plaintiff, i.e., that Mr. Conroy was more qualified. Thus, the undersigned recommends that the job criteria should be considered collectively rather than individually. However, the undersigned will address each purported inconsistency in turn.

First, Plaintiff argues that Defendant initially indicated that Plaintiff was not selected due to a lack of experience outside of Vision Care. (*Id.* at 6.) Plaintiff argues further that Defendant has since recognized that Plaintiff had experience outside of Vision Care, and has thus claimed that "diverse experiences at high levels in the recent past" was required. (*Id.*) Plaintiff argues that this post-hoc, inconsistent justification for not selecting her is evidence of pretext. (*Id.*)

16

Mr. Benson noted that Plaintiff's experience outside of Vision Care was at a much lower level than that of the Position.  (Doc. 24-3 at 77.)  Mr. Benson also testified regarding the importance of high-level experience outside of Vision Care so the person selected could bring a new perspective to the Position.  (*Id.* at 75–76, 141–42.)  In discussing all of the Jacksonville candidates, including Plaintiff, Mr. Benson testified:

> There was a lot of talent down there that we would have considered.  And the discussion typically would have gone back to ultimately in this job we were wanting experience from outside of Vision Care, a fresh set of eyes, somebody who could bring in a whole new set of experiences in product development and blend them with the strength of the team down there to build better processes, better capabilities for the long term.  And that was a key criteria.  But at the same time, we're trying to keep an open mind and look at that local talent.  But in the end, our position was, no, we do want that broader, diverse experience from outside of Vision Care.  And we ruled out -- initially we reviewed out all the individuals down in Jacksonville because of that.

(*Id.* at 141–42.)  In short, given the nature of the Position, it is not implausible that relevant experience outside of Vision Care would need to be at a high level and somewhat recent as opposed to low-level experience from many years ago.  Thus, the undersigned recommends that this argument be rejected.[13]

---

[13] Plaintiff also argues that a male candidate, Mr. Hawthorne, was interviewed despite lacking any experience outside of Vision Care.  (Doc. 25 at 6.)  The undersigned addresses this argument below.

Next, Plaintiff argues that Mr. Benson's reliance on his "success criteria," as opposed to the job description for the Position, in explaining why he did not interview Plaintiff is disingenuous because the success criteria were not developed until after he had already decided not to interview Plaintiff.[14]   (Doc. 25 at 6–8.) Plaintiff argues that this post-hoc justification is evidence of pretext.  (*Id.*)

In support, Plaintiff cites an email informing interviewers of the relevant success criteria for the Position that was apparently sent after two interviewees had already been selected.  (Doc. 24-4 at 51.)  However, this email does not indicate that the success criteria had been developed after the interviewees were selected.  (*Id.*) In fact, Mr. Benson relied on the success criteria when explaining why numerous candidates, including Plaintiff, were not selected for an interview.  (Doc. 24-3 at 80–82, 143–52.)[15]   Moreover, Mr. Benson testified that the success criteria were developed and used in conjunction with the job description, and that the success criteria were not exhaustive, but rather "the top five to focus on."  (*Id.* at 71–73, 158.) Finally, Plaintiff does not identify any material inconsistencies between the job

---

[14] The job description is a detailed, single-spaced document that spans over three pages.  (Doc. 24-14 at 16–19.)  The "success criteria," which are set forth in footnote 8 herein, are the five key criteria that Defendant focused on when filling the Position.  (Doc. 24-4 at 51; Doc. 24-3 at 158.)

[15] Regarding Plaintiff, Mr. Benson testified that Plaintiff did not have "[p]otential to move on and up in J&J supply chain; experience outside of Vision Care, relevant eye-level [sic] experience; and broad supply chain experience."  (Doc. 24-3 at 82.)

description and the success criteria.  (Doc. 25 at 6–7.)  Thus, the undersigned recommends that this argument be rejected.

### 4.    Different Treatment of Male and Female Candidates

Plaintiff makes two arguments regarding Defendant's purported different treatment of male and female candidates, which Plaintiff argues is evidence of pretext.  First, Plaintiff argues that Defendant interviewed two male candidates, Mr. Hawthorne and Mr. Troupe, who did not meet the relevant criteria for the Position. (Doc. 25 at 6, 11–12.)  Plaintiff notes that, although she had some experience outside of Vision Care, Mr. Hawthorne was interviewed despite lacking any experience outside of Vision Care.  (*Id.* at 6.)  However, Mr. Benson testified that he did not intend to interview Mr. Hawthorne, but that Mr. Hawthorne was interviewed "almost [as] a token gesture" primarily due to "significant pressure" by Ms. Love to consider a candidate from Jacksonville.  (Doc. 24-3 at 77–79.)  Mr. Montemurno testified to the same. (Doc. 24-9 at 72–73, 102.)  Additionally, Mr. Benson testified that while experience outside of Vision Care was one important factor in selecting interviewees, it was not dispositive because creating a slate of people with different qualifications and experiences was important.  (Doc. 24-3 at 78–79.)  As noted above, Mr. Benson testified that it is rare that a candidate meets every criteria, and that exceptions can be made.  (*Id.* at 71.)  Mr. Benson also believed that, overall, Mr. Hawthorne was a stronger candidate than Plaintiff because of his greater exposure to the leadership team.  (*Id.* at 112–13.)

19

In arguing that Mr. Troupe was "even less qualified than Hawthorne," Plaintiff cites Mr. Benson's testimony noting that, *after the interviews*, Mr. Troupe was rated lower than the other two interviewees.  (Doc. 25 at 12; Doc. 24-5 at 32–35.)  However, this does not support Plaintiff's position that Mr. Troupe was not qualified to be interviewed in the first place.  Moreover, Mr. Benson testified that although Mr. Troupe lacked medical device experience, he was strong in other areas.  (Doc. 24-3 at 147–48.)  Thus, the undersigned recommends that the Court reject Plaintiff's argument that Defendant's decision to interview Mr. Hawthorne and Mr. Troupe creates a factual issue regarding pretext.

Next, Plaintiff argues that there is no documentation suggesting that the two other female candidates, who were not interviewed, were ever seriously considered.[16]  (Doc. 25 at 20.)  Mr. Benson testified that Barbara Mooney, who was located through talent recruitment, was based in Chicago.  (Doc. 24-3 at 149–50.)  He believed that she could not relocate so she would have been ruled out quickly.  (*Id.*)  Mr. Montemurno testified to the same.  (Doc. 24-9 at 32–33.)

Additionally, Mr. Benson testified that he had previously worked with Denise Fuzak and knew that she was a strong talent.  (Doc. 24-3 at 149, 152–53.)  He stated that he would have needed only to get input from her management, via telephone, regarding her performance over the last five years.  (*Id.* at 152–53.)  Moreover, as noted above, Mr. Benson testified that extensive document review

---

[16] Several male candidates were also not interviewed.  (Doc. 24-3 at 143–52.)

would not generally be conducted on any candidate until the candidate was selected for an interview.  (*Id.* at 72–73, 154–55.)  Thus, the undersigned recommends that Plaintiff's argument regarding a lack of documentation concerning the two other female candidates does not create a factual issue regarding pretext.

### 5.    Plaintiff's Qualifications

The remainder of Plaintiff's arguments essentially seek to establish that she was more qualified than those who were interviewed, including Mr. Conroy.  (*See* Doc. 25 at 8–14.)  However, regarding qualifications, "a plaintiff must show that the disparities between the successful applicant's and his own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff."  *See Springer*, 509 F.3d at 1349.  Plaintiff does not argue, much less show, that this standard can be met.

Rather, Plaintiff points to certain individual criteria where she was purportedly more qualified than the interviewees, including Mr. Conroy.  For example, as set forth above, Plaintiff argues that she had previous experience outside of Vision Care and Mr. Hawthorne did not, and that she was rated "Ready Now" for the Position and Mr. Conroy was not.  (Doc. 25 at 1–2, 6.)  Additionally, Plaintiff argues, among other things, that her "Credo Survey" results, which evaluate various leadership factors, were stronger than those of both internal candidates interviewed.  (*Id.* at 10.)  As noted above, numerous factors were considered when determining who would be

interviewed, no one factor was dispositive, and exceptions to the relevant criteria could be made.  (Doc. 24-3 at 23–24, 71; Doc. 24-14 at 16–19; Doc. 24-4 at 51.) The remainder of Plaintiff's arguments regarding her qualifications essentially seek to establish only that she met the job criteria and was thus qualified.  The undersigned recommends that there is no genuine factual issue in light of the standard set forth above.

Plaintiff also argues that there is insufficient evidence to show that Defendant performed any real comparison between her qualifications and those of the interviewees.  (Doc. 25 at 12–13.)  As noted above, candidates were discussed on a rolling basis, the slate of competitive candidates was constantly changing, Mr. Benson did not engage in extensive document review until after interviewees were selected, and candidates were narrowed down quickly due to the strength of the competition.  (Doc. 24-3 at 59–62, 72–73, 102, 141–43, 147, 154–55.)  Moreover, Mr. Montemurno explicitly stated in an email that he did not believe that Plaintiff had a "real chance" against Mr. Troupe or Mr. Conroy, and he testified that he believed they were both stronger candidates than Plaintiff.  (Doc. 24-9 at 103; Doc. 24-10 at 40.)  Additionally, Mr. Benson testified that he believed Mr. Hawthorne was a stronger candidate than Plaintiff.  (Doc. 24-3 at 112–13.)  Thus, the undersigned recommends that the evidence of Defendant's level of consideration of Plaintiff does not reveal such implausibility as to create a factual issue regarding pretext.

In short, the undersigned recommends that Plaintiff's arguments regarding qualifications are essentially "quarreling with the wisdom" of Defendant's decision, and they ask the Court to reexamine Defendant's business decision to select Mr. Conroy instead of Plaintiff. (*See* Doc. 25 at 8–14.) That is not the Court's function. *See Furcron*, 843 F.3d at 1314; *Johnson*, 517 F. App'x at 936 ("[W]hen analyzing the issue of pretext, the [f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions.") (quotations omitted). Therefore, the undersigned recommends that the remainder of Plaintiff's arguments be rejected.

## IV.    Conclusion

Having considered all of the evidence and Plaintiff's arguments individually and in combination, the undersigned recommends that the evidence does not reveal such "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in Defendant's proffered reason to promote Mr. Conroy instead of Plaintiff "that a reasonable factfinder could find it unworthy of credence." *See Furcron*, 843 F.3d at 1313–14. The undersigned further recommends that the evidence does not show that "no reasonable person . . . could have chosen" Mr. Conroy over Plaintiff. *See Springer*, 509 F.3d at 1349. Thus, the undersigned recommends that there is no genuine issue of material fact regarding pretext and that summary judgment should be entered in favor of Defendant.

Accordingly, it is respectfully **RECOMMENDED** that:

1.    The Motion (**Doc. 21**) be **GRANTED**.

2.     The Clerk of Court be directed to enter final judgment in favor of Defendant and against Plaintiff, terminate any pending motions, and close the file.

**DONE AND ENTERED** at Jacksonville, Florida, on May 28, 2019.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record